**UNITED STATES of America, Appellee,**

v.

**1,132.50 ACRES OF LAND, ETC., UPPER ALLEGHENY SAND & GRAVEL CO., Inc., Appellant.**

**No. 628, Docket 35516.**

United States Court of Appeals, Second Circuit.

Argued March 23, 1971.

Decided April 14, 1971.

Dennis M. O'Connell, Greenbelt, Md., Atty. (Shiro Kashiwa, Asst. Atty. Gen., Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., H. Kenneth Schroeder, U. S. Atty., C. Donald O'Connor, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for appellee.

Benjamin C. Perreault, Salamanca, N. Y. (Congdon, Congdon & Perreault, Salamanca, N. Y., of counsel), for appellant.

Arthur Lazarus, Jr., Washington, D. C. (Patricia Roberts Harris, Strasser, Spiegelberg, Fried, Frank & Kampelman, Washington, D. C., of counsel), for defendant Seneca Nation of Indians.

Before WATERMAN, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

As part of the Allegheny River Reservoir (Kinzua Dam) Project in southwestern New York State, the United States in 1963 acquired by condemnation flowage rights and other easements on some 10,-000 acres in the Allegheny Reservation of the Seneca Nation of Indians (Seneca). The United States and Seneca reached an accord on the fair market value of all but 1,345 acres of the land thus taken, and neither has appealed from the trial judge's determination of that dispute. The conflict which has our attention concerns eighty acres of the land which had been leased in 1948 to the Upper Allegheny Sand & Gravel Company (Allegheny) for 20 years and upon which it had erected a sand and gravel processing plant. Allegheny has assigned a number of errors in the calculation of the just compensation which it claims is due to it. Finding no reversible error, we affirm the district court's award.

### 1. *Fixtures*

█ █ After some hesitation, it appears that the United States stipulated in the court below that the bulk of Allegheny's plant equipment, consisting of permanently mounted crushing, washing, sorting, and conveying machinery, was compensable real property. The United

States thus agreed in effect that the equipment could not be removed without substantial damage to itself or to the remaining real property and was therefore a "fixture" under New York law.[1] Several witnesses testified that this equipment was poorly engineered, inefficient and of considerable age. It appears that some components were literally held together with baling wire. Moreover, the auctioneer who sold the equipment testified that Allegheny's plant was the smallest of the more than 100 that he had sold. The equipment was auctioned off on a piecemeal, buyer-to-remove basis for a total of $9060. Using this sum as an indication of fair market value Judge Henderson fixed that amount as representing just compensation.

It is well settled in this circuit that a tenant who has installed fixtures in property condemned by the United States need not content himself with their salvage value when the government has made their continued use in place impossible. See United States v. Certain Property, etc. (Il Progresso), 306 F.2d 439, 448 (2d Cir. 1962). See also United States v. Certain Property, etc. (Lafayette Nut Product), 344 F.2d 142, 146 (2d Cir. 1965); United States v. Certain Property, etc. (193 Realty Corp.), 388 F. 2d 596, 600 (2d Cir. 1968) (en banc). Because these fixtures diminish in value upon removal, a measure of damages less than their fair market value for use in place would constitute a substantial taking without just compensation. "[I]t is intolerable that the state, after condemning a factory or warehouse, should surrender to the owner a stock of secondhand machinery and in so doing discharge the full measure of its duty." Jackson v. State, 213 N.Y. 34, 35, 106 N.E. 758 (1914) (Cardozo, J.).

Normally the value of trade fixtures for use in place will exceed their salvage value. But if a lessee has located or arranged his machinery or other fixtures in such a manner that their full economic potential cannot be realized on the premises, it is not inconceivable that the market will value them more highly for a better use elsewhere. This appears to have been the situation at Allegheny, for the government's auctioneer estimated the value of the fixtures "as an existing plant" to be only $8000–8500. Judge Henderson was well within his discretion in crediting the testimony of a witness with extensive knowledge of the market in sand and gravel plants.[2] The only alternative estimate provided by Allegheny's expert witnesses was the reproduction cost of the machinery, depreciated at what they considered a percentage appropriate to its age and condition. This method of approximating fair market value, while relevant, see 306 F.2d at 448, can hardly be determinative of the question. It does not take into consideration the possibility that under present market conditions the equipment would not be reproduced even at the depreciated price. See United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 403, 70 S.Ct. 217, 94 L.Ed. 195 (1949); United States v. 55.22 Acres of Land, 411 F.2d 432 (9th Cir. 1969).

---

1. New York law is relevant on this question not because it is binding upon federal courts under Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), but because federal substantive law takes the practical view that the state rule should be adopted. If federal courts insisted on developing a divergent body of law, property owners in planning their affairs would be compelled to take account of two conflicting rules of compensability, never knowing until the moment of taking which one governed. See United States v. Certain Property, etc. (Il Progresso), 306 F.2d 439, 444–445 (2d Cir. 1962).

2. The government witness did not state in these precise words that his $8000–8500 estimate represented the equipment's value for use in place. Other portions of his testimony, and the fact that the highest bulk bid at the auction was $8500, provide a basis for arguing that his evaluation was made on a buyer-to-remove basis. Nevertheless, the natural and most likely meaning of the phrase "as an existing plant" refers to use in place, and the trial court did not clearly err in understanding the testimony in this fashion.

Because the value of Allegheny's machinery for use in place was thus on the low side, the trial court quite properly exercised its judgment in awarding the higher piecemeal salvage value. Salvage value in a case such as this places a fairer value on the price of equipment. It represents, in effect, a sale between a willing buyer and willing seller.[3]

### 2. Buildings

■ Two buildings had been erected on Allegheny's leased property in 1948. The "scale house" contained the equipment used in weighing loaded trucks as they left the plant, and the "power house" enclosed a diesel generator, the plant's sole source of power. Allegheny's experts, using the depreciated reproduction cost method once again, estimated their combined worth at $15,175. In giving little weight to this figure, the trial court could properly consider, in addition to the inherent limitations of this approach, the fact that the entire plant—equipment, buildings, and existing stockpiles—had been acquired from Allegheny's predecessor at a 1954 public foreclosure sale for only $20,000. Cf. 306 F.2d at 448. The government's expert appraiser testified that the buildings were worth no more than $1500 on the prevailing real estate market. Although this may have rested heavily on the relatively short five-year period remaining in Allegheny's lease,[4] cf. United States v. Certain Property, etc. (193 Realty Corp.), 388 F.2d 596 (2d Cir. 1968) (en banc), the court's award of $3000 was substantially higher than the government's expert calculated. We cannot say that Judge Henderson's award was clearly erroneous.

### 3. Value of Lease

■ The testimony of several witnesses established that the site could not be competitively exploited without a substantial new investment in a modern plant. There was testimony also that investment to make the plant competitive—estimated by one witness to be $250,000—would be totally unattractive to anyone on the basis of a short term five-year lease. That Allegheny managed to turn a small profit using its old and inefficient equipment is hardly conclusive proof to the contrary; indeed, the evidence credited by Judge Henderson indicated that a rational buyer of the plant would have sold the existing equipment on a piecemeal basis rather than continue using it. The trial court thus appropriately found that the remaining five year term of Allegheny's lease, despite its favorable rent of 5 cents per ton sold, had no market value.

Seneca's lease with Allegheny also granted an option to open two additional gravel pits on the Reservation on the same terms. Assuming *arguendo* that Allegheny could have exercised the option unilaterally, there was no evidence to indicate the economic feasibility of doing so and thus it remained sheer speculation. The court's conclusion that these rights had no market value was therefore entirely justified.

### 4. Value of Stockpiles of Processed Sand and Gravel

■ Allegheny ceased production in mid-1964 and continued selling its existing inventory of sand and gravel until April 1, 1967, when the backwaters of the Kinzua Dam flooded the area of the

---

3. Allegheny also complains that the trial court failed to account for vandalism that occurred after the declaration of taking but before the government's witness surveyed the plant, citing the recent decision of the New York Court of Appeals in Chester Litho, Inc. v. Palisades Interstate Park Comm'n., 27 N.Y.2d 323, 317 N.Y.S.2d 761, 266 N.E.2d 229 (1971). Since Allegheny failed to present any evidence concerning the extent or money value of the vandalism, the denial of this claim was proper.

4. The witness testified that he had not calculated the worth of the buildings with mathematical precision "because I could not see any use for the buildings as buildings after the lease had expired."

stockpiles. Because the high cost of relocating these bulk items made their removal to higher ground impractical, most of these "compulsory" sales, Allegheny argues, were made at artificially depressed prices. Despite all, some 21,000 tons of sand and gravel, said to be worth $25,000, remained and were submerged by the Allegheny River Reservoir.

The district court's denial of compensation for this loss was not erroneous. Under New York law, see note 1 *supra*, the sand and gravel were Allegheny's personal property rather than a "fixture" of the land for eminent domain purposes. Certainly, the sand and gravel could have been removed without damage to the freehold or the removed property, see p. 2423, *supra*. Although a lessee's costs of removing personal property from condemned premises may seem clearly attributable to the government's taking, we have not been cited to any case requiring the state to compensate for all adverse effects ultimately flowing from a condemnation. Indeed, both state and federal courts, including this court, see In re Post Office Site, 210 F. 832 (2d Cir. 1914), have traditionally denied compensation for the expense of moving personal property. See 4 Nichols, Eminent Domain § 14.2471[2], at 667–73 (Sackman 3d ed., 1962); Gershon Bros. Co. v. United States, 284 F. 849 (5th Cir. 1922); William Wrigley Jr. Co. v. United States, 75 Ct.Cl. 569, 583–584 (1932); cf. United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). In part this rule derives from the notion that a lessee cannot justifiably expect that he will be able to keep personal property on the leased premises indefinitely. E. g., Gershon Bros. Co. v. United States, *supra*. It also rests on the principle that there has been no "taking" when the lessee is free to remove the property in undamaged condition. E. g., Springfield S. W. Ry. v. Schweitzer, 173 Mo.App. 650, 158 S.W. 1058 (1913). There appears to be still an-

other reason for this rule. It would be virtually impossible to be sure that a government-subsidized move would not put the condemnee in a better position than he enjoyed before the taking. In Allegheny's case, for example, transportation costs have always been a significant factor in calculating the price to be paid by a buyer. A court would be compelled to engage in the most speculative marketing calculations to determine the difference in value between identical stockpiles of sand and gravel because of its closer proximity to the place of delivery, and then to apply this difference against the removal cost.[5] Such damages are simply too conjectural and remote from the government's taking of land to be the subject of compensation. See In re Post Office Site, *supra*.

Judgment affirmed.

---

5. The cost of purchasing a new sand and gravel stockpile—the measure of damages which Allegheny apparently sought below —would of course be a ceiling on any award of moving costs.