**C. Lester PAUL, d/b/a Viking Petroleum Properties,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 362–87L.

United States Claims Court.

Aug. 30, 1990.

John R. Lowery, Atlanta, Ga., for plaintiff.

Margaret M. Sweeney, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action claiming a fifth amendment taking of certain personal property. The property at issue was located on a third party's land when the land was condemned by the United States. After consideration of the evidence adduced at trial, and for the reasons stated below, the court concludes that the United States took items of plaintiff's personal property and is obligated to pay the value of that property, plus interest, and to reimburse plaintiff for reasonable attorneys' fees and costs.

## BACKGROUND

In January of 1974, plaintiff, doing business as Viking Petroleum Properties ("Paul" or "Viking"), obtained, by lease, oil and gas rights in property owned by William Wells in Lawrence County, Kentucky. Under the terms of the lease, plaintiff obtained a seven-eighths working interest. He obtained these rights from Homer Robinson, who originally had leases on the Wells tract and on an adjoining property known as the Short tract. Paul testified that when he took the lease, he was aware that the United States would eventually condemn Wells' land in connection with a plan to dam a tributary of the Ohio River. Paul in fact stated that his primary purpose in taking the lease was to rework the wells and get production under way, thereby enhancing the value of his seven-eighths working interest prior to condemnation. He testified that he had also hoped to make a profit from the production of oil and gas.

The assignment of the oil and gas lease to plaintiff contained a "catch-all" clause providing for the sale of all personal prop-

erty on the land to plaintiff. Paul testified that there was an old, inoperable pump jack[1] on the property. Scattered near a barn on the property were a 60 barrel separator, rods and tubing, a pumping tee, a mound of old, two inch line pipe, and a mound of eleven and a half inch thread line pipe which "was probably junk."

There were a total of seven oil and gas wells[2] on the property when Paul acquired the lease. These wells, which were roughly 1,500 feet deep, had been drilled in the early and mid sixties. The wells had casing in them. On most of the wells one could see nine and five-eighths and seven inch casing protruding. As to the condition of the casing on the wells, Paul stated that data obtained from the Kentucky Geological Survey did not indicate whether any of the casing had been "pulled" or "soaked"[3] and that "all we knew was there was some casing there that could be utilized, if possible, for surface or intermediate strength." In any event, there were no heads on the wells, and, in Paul's judgment, the wells were not ready to be fitted for operation. Paul therefore began the process of reconditioning, or "reworking," the wells.

Paul did not attempt to rework two of the wells, however. One, designated No. 4[4] and located near the house of Alf Matney, a tenant who lived on the Wells tract, had on it an apparatus which Paul referred to as a "Christmas tree," apparently a gauge. This well was supplying gas to Matney's house when Paul acquired the lease. Several witnesses, including Paul, testified that Matney did not want Paul's men working on this well and that to avoid trouble they left it alone.

The other well which was not reworked was designated No. 7. It had been abandoned before Paul acquired the lease because tools had been dropped down the well during drilling and attempts to recover them had been unsuccessful. Paul stated that this well could not be made operational. Ultimately, therefore, only five wells were potentially available for oil and gas production.[5]

Paul described the equipment and procedures he employed in reworking the wells on the property.[6] First, a four and a half inch string of pipe was installed down the well hole. This was new "J–55 eight round casing." He inserted this pipe into the well on a "hook wall packer."[7] Paul used between 1,200 and 1,400 feet of such tubing in each well. He testified that he also installed what he called two and three eighths inch "upset" through which the oil and gas would ultimately travel. This "upset" tubing went down the entire length of the well. The largest casing, the nine and three eighths inch casing which was already in place in the wells, did not need to be replaced.

After the new tubing was in place, a down hole pump with "spring-loaded, double cage balls and seats" was installed in the pump. The next step was to setup a pump jack, the apparatus which creates a

---

1. A pump jack resembles a rockinghorse. It is the mechanism which generates the pressure needed to force oil and gas out of the well.

2. The wells were capable of producing oil and gas simultaneously. The oil and gas is later separated out by a "separator."

3. Paul did not elaborate on what he meant by these terms. Apparently, they bear on the condition of the casing. Plaintiff is not seeking to recover the value of the original casing.

4. Plaintiff introduced at trial a large map which indicated the location of the seven wells on the tract. Each of the seven wells was referred to by a number—Nos. 1, 2, 4, 6, 7, 8, and 10. This is the same numbering system that was used when the Wells tract was active.

5. When asked if he reworked the "six ... available wells," Paul testified, "[a]bsolutely, every one of them." Apparently this inconsistency is simply an error in keeping track of the number of wells on the property. Paul later stated, after testifying that he put a pump jack on each of the six wells, corrected himself, noting that no pump jack was put on well No. 4. However, he stated that he had purchased one for that purpose and that it was on the property.

6. In his testimony on reworking a well, Paul used terms from the oil and gas industry without explanation. The court will describe the equipment to the extent it was described to the court.

7. A hook wall packer remains in the well permanently.

differential in pressure to force oil and gas out of the well. Because there was no electricity on the Wells tract, Paul installed gasoline engines, which he testified were all new, to operate the jacks. He also installed 30 gallon tanks for gasoline. The only equipment leftover from Robinson which could be used were the largest casings in the well bore.

Paul also constructed an elaborate system of flow lines to carry oil and gas from the wells to separators (which separate the oil from the gas) and to storage tanks. Paul described the flow line as "ten inch round thread line pipe." He testified that it was all new and that 14,000 feet were installed. Paul brought three storage tanks onto the property, one 210 barrel and two new 100 barrel tanks. According to Paul, one 65 barrel storage tank was already on the property.[8] There were two separators. There was also a deduct meter on the property, which measured the flow of gas from an adjacent tract.

In addition to the equipment which Paul used in reworking the wells, there was stored on the property a significant amount of supply equipment and spare parts, such as "casing, tubing, down hole pump, assembl[ies], spare balls and seat[s], caging, all types of items you would need." Equipment was stored on site because there was no oil supply store nearby. Generally, larger equipment was stored around the barn or inside it, and smaller equipment was stored in a "corncrib" nearby. Paul stated that the equipment which he stored on the property was there "until the day we left."

Plaintiff had numerous problems in getting the wells to run properly. He never succeeded in having all of the reworked wells run simultaneously. Viking never showed a profit. Paul's involvement with the Wells tract ended on October 29, 1976 when the Lawrence County (Kentucky) Circuit Court entered a judgment terminating

his lease, based on Wells' assertion that there had been a breach. Paul was allowed ninety days to enter the property to remove his oil and gas drilling equipment. He did not remove the equipment within this time period. However, sometime afterwards, in the spring of that year, he removed his "rolling stock" which consisted of "rigs, dozers, tractors, those kind of things." At that time he also removed "a couple hundred feet" of seven inch casing to be used on a nearby property.

Paul testified that his men later attempted to remove some additional equipment, but that they had difficulty with Mr. Wells who threatened some of Paul's men with a pistol. According to Edgar Yates, one of Paul's employees at the time, Paul's men succeeded in removing approximately "fifteen joints" of pipe.

On May 16, 1977, Wells sought and obtained a restraining order to prevent Paul from entering the property. This was the last time plaintiff was on the property before June 28, 1977, when the Army Corps of Engineers ("Corps") filed a Declaration of Taking in the United States District Court for the Eastern District of Kentucky, *U.S.A. v. 978.29 Acres of Land,* Civil Action No. 77–82 (E.D.Ky.), seeking to condemn the Wells tract as part of a Corps flood control project known as the Yatesville Lake Project.[9] Wells and others, not including plaintiff, were named as defendants.

Several months after the condemnation proceeding, Paul sought a dissolution of the restraining order. He was successful, and an order was issued on January 19, 1978. Paul testified in the case at bar, however, that because of the condemnation proceeding the Corps would not permit him to enter the property to remove his equipment. The Corps did tell Paul that if he were willing to pay $100 per well, he could have the job of plugging and abandoning

---

**8.** Paul initially referred to this as a 60 barrel storage tank which had been on the property when he acquired his lease from Wells.

**9.** The project involved creating an approximately 7,000 acre lake on Blaine Creek, one of the

tributaries of the Ohio River. Wells' property was only a small part of the approximately 21,000 acres which the Corps anticipated acquiring. As of the time of trial, a dam had been built, but it had not been impounded.

the wells and that he could take any equipment that he could salvage. This offer was made in early January of 1978. Paul refused this offer. He later requested permission from a Corps employee named Donald Thompson, whom Paul described as the "project manager," to enter for the sole purpose of taking some line pipe which was not connected to the well apparatus. Thompson allowed Paul to enter and Paul removed "between 200 and 300 feet of ten round line pipe, two inches." Paul stated that no one from his company has been on the property since the Corps permitted him to remove the line pipe.

On April 16, 1980, Paul filed a notice of appearance in the condemnation proceeding and was thereafter made a defendant in that action. Paul testified that he "beg[ged] the [district] court to let [him] get [his equipment]," but that because of the condemnation action he was not allowed onto the property. Had he been allowed on the property, Paul believes he would have succeeded in recovering everything except the old casing that was in the wells when he obtained the lease. He stated that the cost of removing all the equipment and plugging [10] all the wells would have been approximately $20,000.

On May 20, 1987, the district court entered an order determining that the oil and gas equipment on the property was personalty, that it had not been abandoned prior to the condemnation action, and that it belonged to Paul. The court went on to hold, however, that pursuant to the Tucker Act, 28 U.S.C. § 1491 (1988), Paul's claims were properly before the Claims Court, apparently taking the view that the condemnation did not reach personalty taken from individuals not named in the condemnation proceeding. By the district court's order of June 10, 1987, Paul's claims were transferred here.[11]

The testimony at trial focused almost exclusively on the question of what equipment was on the Wells tract at or near the time of the condemnation proceeding. The key testimony is summarized below.

Plaintiff testified that an accurate inventory of the equipment which was on the leasehold at the time of taking is represented by a depreciation schedule prepared in connection with a Viking federal income tax return. The depreciation schedule was prepared by Paul and his accountant, Ed Scofield. Although its precise date is unclear, it was attached to a tax return for calendar year 1975. The schedule is two pages long and has over sixty entries.

The depreciation schedule is the only document which purports to specify what personalty was on Wells' property when it was condemned. However, several of Paul's employees testified regarding what equipment was on the property near the time of the taking. Michael W. Paul, Sr., plaintiff's son, worked for his father on the Wells tract, installing some of the wells and laying down flow lines. Like his father, he testified that the flow line was new when installed. Although he did not have an estimate of how much flow line was installed, he said there was "a lot of it." He remembered that there was a pump jack on every well; some were new and some were used. He stated that he delivered the brand new engines which were to power the pump jacks, and that there were "four, five, six, seven, I don't really remember." He also recalled installing gasoline tanks. Michael Paul also testified that there were two, 100 barrel storage tanks and one 210 barrel storage tank, two separators, and a deduct meter on the property. With respect to spare equipment stored on the property, Michael Paul stated that there were "pipes of all different sizes" around the barn, as well as pump jacks, though he was unable to specify quantity. In the corncrib, there were stored "all kinds of down hole production

---

**10.** Kentucky law requires that abandoned wells be plugged.

**11.** On June 5, 1986, Paul received a $9,000 award when the district court was giving disbursements to landowners. According to the Government, this amount was mistakenly paid because plaintiff was not a landowner. Counsel for plaintiff stipulated at trial that Paul represented to the district court that the $9,000 would be offset against any reward received in the Claims Court litigation.

things and pumping tees," which Michael Paul stated were all new. He was last on the property in the fall of 1976.

Edgar Yates is a welder who began working for plaintiff in August 1975. He worked on the Wells tract shortly thereafter. He performed various tasks for plaintiff at the Wells tract, including welding chains to the pump jack motors to prevent them from being stolen. He remembers working on three motors, which he stated were all new, and also assisted in installing some gas tanks. He did not, however, visit every well. He also admitted that he did not spend much time on the tract. With respect to equipment stored on the property, Yates recalls that around the barn were "casing and tubing, pump jacks, stuff like that." In total, Yates stated that he remembers "six or seven" pump jacks on the property, either on the wells or stored near the barn. In the corncrib Yates recalls "different things for the wells going in—fittings; pipe fittings; and there's packers in there; brass pump parts; and there's two or three gas engines sitting in there; a bunch of well heads; all kinds of gaskets to go around to seal them; and the well plates; this type of stuff." Yates does not recall any property being removed from the Wells tract during the time it was being operated. However, he was involved in the incident in May 1977 when Wells threatened Paul's men with a gun and recalls that about fifteen joints of tubing were removed that day.

David Wayne Sneed is another former employee who testified for plaintiff. He worked for Paul from the fall of 1973 until late summer of 1977. He "did a little bit of everything" on the Wells tract, including laying pipeline, resurfacing wells, and running equipment. Sneed remembered "two to three" tractor trailer loads of flow line being installed on the property. He himself installed or transported for installation pump jacks on every one of the wells which was reworked. In addition, Sneed testified that he picked up from the airport two or three of the new gasoline engines used to power the pump jacks. Sneed confirmed earlier testimony that there were three storage tanks on the property. In addition, he remembered the two separators and the deduct meter.

Sneed also described what was in the storage area as of the last time he was there, in early Spring of 1977. There was still a "good size stack of two inch; and there was a fair size stack of four inch; and some seven inch.... There was four—three or four pump jacks." As far as down hole equipment, there was "[l]ots of two inch.... There was ten round and there was eight round." In the corncrib there was "just miscellaneous of anything that you would need on working on a well.... There was standing valves. There was check valves. There was pumps, balls and seats. There was working barrels, tees of every kind, short rods, polishing rods, bridles for well heads—pump jack heads...."

The final witness to testify for plaintiff was Joe Norris Collins, Jr. On the Wells tract, Collins did "generally everything ... whatever needed to be done." Like plaintiff's other witnesses, Collins recalls a significant amount of flow line being installed on the Wells' property. Collins recalls pump jacks on every well except the one near Matney's house and well No. 7. With respect to storage tanks, he remembered that at one time there was a 100 barrel and a 210 barrel tank. He recalled two separators and a deduct meter on the property. He also recalled the gasoline engines and that they were new, but did not state how many there were.

Regarding equipment stored on the property, Collins testified that as of the last time he was on the property, the crib was "generally full of stuff when I left. It had elbows; pumping tees; valves; nipples ... [e]verything that you need to put the well on pump...." He stated further that the equipment in the crib was all new. Collins testified that although the crib at one time had a padlock on it, it had been broken off by the time he left. Around the barn were pump jacks (Collins remembers four) and pipe lying on the ground, mostly two inch and some four and a half inch.

Several of plaintiff's witnesses commented that there were occasional problems with theft on the property. For example, Collins remembers that an arm was stolen from one of the pump jacks. Michael Paul admitted that when Matney was not "on our good side" they sometimes had things stolen. In particular, he remembers that tires were stolen from the back of a truck. Yates recalls that people would steal batteries from the trucks if they were left on the property.

Robert R. Jeter was a witness for the United States. He is a Corps employee who was involved with the Yatesville project since its inception. One of his duties was to conduct mineral appraisals for land to be condemned. Such appraisals involved a mandatory physical inspection. Jeter testified that he was on the Wells tract approximately twelve times, beginning in December of 1976. In all his visits, Jeter never saw a pump operating.

Jeter was on the property as late as July 1977, the month after the Corps' condemnation proceeding. He testified initially that he did not recall there being any more equipment on the property in July 1977 than when he observed it on his visits before the taking. Later, however, he stated that there was an additional pump jack on the property in July. During his July visit, Jeter took photographs of the equipment on the property, which were introduced into evidence as Defendant's Exhibit 12. His purpose in taking these photographs was to take inventory, but he stated that another employee who was with him "was in charge of the oil and gas part of it.... I was more interested in the coal properties." Jeter expected the Corps would be taking any equipment on the property.

Exhibit 12 consists of five photographs of wells labelled 1, 6, 7, 8, and 9.[12] Only well No. 6 has what appears to be a complete pump jack assembly, including a motor and a gas tank. Well No. 9 has a part of a pump jack assembly attached to it, but the part of the pump jack referred to as the "horse's head" is missing. There does not appear to be a working motor, and there is no gas tank. In Jeter's photographs, wells Nos. 1, 7, and 8 have no surface equipment attached.

Jeter did not take photographs of every well or every piece of equipment, though he did visit every well. He recalled specifically one additional pump jack which he did not photograph. It was attached to a well. He also stated that there were two storage tanks on the property, one approximately a 200 barrel, one smaller one, and several "half tanks." He remembers in addition the two oil and gas separators and the deduct meter. Although Jeter recalls flow line on the property, he stated that some of it was buried, and it "was difficult to tell exactly what was out there."

Jeter testified briefly regarding equipment stored on the property: "I don't ever recall seeing any equipment stored in and around the barn." He did not ever look inside the barn, though he stated that it was in such a dilapidated condition that one could see into it.

Defendant also offered the testimony of Edmund Nosow as both a fact witness and an expert witness as to value. Nosow had been hired by the Corps in connection with the Yatesville project to evaluate the Wells property as to the value of its reserves and the value of the oil and gas equipment. Nosow visited the property a total of seven or eight times and was there both before and after the condemnation proceeding. Nosow testified that he had obtained well logs on all the wells that had been drilled on the property and that he walked all the flow lines on the property.

When Nosow was on the property around February 1977, he took photographs. These were introduced as Defendant's Exhibit 2. There are 17 photographs, labelled 2–18. The photographs marked 2, 3, and 4 are of well No. 1.

---

12. None of plaintiff's witnesses referred to a well No. 9. Well No. 9 was not noted on the map provided by defendant. When questioned regarding well No. 9, Jeter responded that "there has been some confusion as to the num-

bering of the wells on the property I would say that." Edmund Nosow, who testified later for defendant, *see infra,* explained that well No. 9 was left off the original map.

Photograph 4 shows what appears to be an operational pump jack, but it is not attached to the well. Nosow testified that in photograph 3 a small oil and gas separator can be seen, as well as a 100 barrel storage tank. In photograph 2, new pipe can be seen stacked up near the well. Nosow estimated, based on the depth of the well, that there was probably 1400 feet of pipe depicted in photograph 2. Photograph 5 shows the 210 gallon storage tank and a separator which is larger than the one visible in photograph 3. Photograph 7 shows the deduct meter. Photograph 8 shows well No. 4, Matney's well. There is no equipment attached to it. Photographs 9 and 10 depict well No. 6. According to Nosow, this well is hooked up with everything needed to run the pump jack. Photographs 11 and 12 show well No. 8. It has no pump jack or any other equipment attached to it. Photographs 13 and 14 show a well designated as No. 9, which Nosow testified was not on the original map. Although there is a pump jack attached to the well, Nosow testified that "the well is not operating because you can see the horse's head … down the top of your casing.… [a]nd the cable is all wound around it.…" Photograph 17 shows well No. 5. There is no pump jack attached to it. The photograph shows two strings of casing, a large size and an intermediate size, protruding from the well, and some pipe above the casing head. There is also depicted, according to Nosow, a rack holding some old sucker rods. However, the well appears to be abandoned.

Thus, according to Nosow, only three wells had pump jacks attached, or pump jacks near them in February 1977. Nosow testified that none of the wells he observed were operational. In fact he described them as "pitiful." He did say that the three wells which had equipment on them, and particularly well No. 6, might have been made operational with a little work. Nosow testified that when he was on the property to take the photographs, he did notice that there was in a shed by the barn (the crib) "a whole scheme of equipment that you might use in these shallow wells."

Nosow was also on the property in June 1977, immediately before the condemnation proceeding. He testified that he was there for the express purpose of determining what equipment was on the property because any equipment was to be taken as part of the condemnation. He said that the same equipment was on the property in June as in February when he took the photographs. Specifically, he saw three pump jacks, the meter house, the two separators, three large storage tanks, and the small 65 barrel tank. However, the pipe which he had photographed near well No. 1 was "long gone." [13] He testified that he saw no spare equipment stored on the property in June. However, he admitted that he did not look in the crib. Nosow opined that the condition of the equipment on the property was "good used."

In its opinion of February 15, 1989, this court addressed the effect of the district court's ruling on the instant litigation. 16 Cl.Ct. 318 (1989). It was held that because the issue of ownership of the equipment arose in the district court proceeding,[14] the district court had to determine whether the equipment was on the land at the time of condemnation, whether it was personalty or fixtures, and whether it had been abandoned prior to the date of condemnation. *Id.* at 320. Because these findings were necessary to the resulting judgment, they were given collateral estoppel effect. *Id.* See *Mother's Restaurant v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983). However, the court held that the question of whether there was a taking of Paul's property was not properly before the district court. Thus, the court held that the district court's conclusion that defendant's conduct constituted a taking was beyond

---

**13.** Nosow admitted on cross examination that it was quite likely that the pipe had been used in reworking the well.

**14.** The question was whether the Wells owned the equipment. If the Wells were the owners, they would be entitled to the entire condemnation award, and no separate valuations would have been necessary with respect to the equipment.

that court's jurisdiction, and therefore, without collateral estoppel effect. 16 Cl.Ct. at 320.

Defendant does not dispute that plaintiff was the owner of certain oil and gas equipment attached to or stored upon the property acquired by the Corps in Civil Action No. 77–82. Nor does it dispute that the United States intended to take all oil and gas equipment which was hooked up in some manner to the wells. The United States, however, refuses to concede that a taking occurred as to Paul's equipment. In addition, it draws a distinction between the district court's finding that plaintiff had not abandoned the property prior to the eminent domain action, with its present defense that there was abandonment after condemnation commenced. It also challenges plaintiff's assessment of what personalty remained as of June 28, 1977 and its value.

## DISCUSSION

### 1. What equipment was on the Wells tract?

■ Of all the witnesses who testified at trial, Nosow was on the property closest to the date of the condemnation proceeding. His testimony is therefore most relevant to the question of what oil and gas equipment was on the property at the time the Wells tract was condemned. The court also finds Nosow's testimony persuasive because he was on the property for the express purpose of doing an inventory, and he visited every well. Plaintiff's employees were on the land performing various tasks at various times during the lease, and not all of them had been to every well. As to plaintiff himself, his testimony was derived not from direct observation, but from a recollection of what he purchased, what would have been needed to rework the wells, and

what supplies were needed. The depreciation schedule, though perhaps an accurate list of items purchased in connection with his venture on the Wells lease, does not indicate when it was prepared and is not derived from direct observation. It is not the best proof of what was on site in June 1977. It is not as persuasive as Nosow's photographs and testimony based on observations made at the time of the taking for the express purpose of determining what equipment was on the property. Nor is Nosow's testimony in conflict with the observations of plaintiff's employees, particularly in view of evidence concerning removal of stockpiled pipe and occasional thefts. The court therefore adopts Nosow's testimony as an accurate indication of what equipment, owned by plaintiff, was on the Wells tract when it was condemned. The court finds that the following equipment was on Wells' land when it was condemned: casing, one 200 barrel storage tank, two 100 barrel storage tanks, one 60 barrel storage tank, 14,000 [15] feet of line pipe (flow line), two separators, six pump jacks, and miscellaneous equipment such as well head assemblies, down hole pumps, tees, ells, couplings, swages, plugs, valves, packers, gas meter assemblies, and well heads.

### 2. Was the equipment abandoned?

■ Defendant asserts that plaintiff failed to remove his personal property subsequent to the condemnation action and that it was therefore abandoned. The defendant does not explain the significance of post-condemnation abandonment.[16] Because the equipment in question is personalty, however, and would under normal circumstances be removed by the condemnee,[17] the court will examine the support for defendant's contention.

15. *See supra* note 23.

16. The district court held, and defendant stipulated, that there had been no abandonment prior to the condemnation proceeding.

17. This court has held that when the United States condemns a leasehold, it is not liable for a direct taking of personal property on that

leasehold if the personalty could have been removed without damage at the time the Government condemned the land. *Rowland v. United States*, 8 Cl.Ct. 267, 270 (1985); *see also Lemmons v. United States*, 204 Ct.Cl. 404, 496 F.2d 864 (1974). Paul testified that he could have removed the property for approximately $20,000 and that he would have been able to recover most of it. The above cases are not controlling,

Abandonment of personal property in a different context is discussed in *Katsaris v. United States*, 684 F.2d 758 (11th Cir. 1982). *Katsaris* was an interpleader action involving money found in connection with a drug arrest. The court states that while cases discussing abandonment of personal property are "few and old," the concept of abandonment as applied to property and property rights "has long had a generally accepted and a well defined and technical meaning." *Id.* at 761–62 (citing *St. Peter's Church v. Bragaw*, 144 N.C. 126, 56 S.E. 688 (1907)). The court recites that abandonment requires two elements, the physical act of abandonment and intent or motive. *Id.* For there to be an abandonment, it is essential that the owner act without coercion or pressure. The doctrine of abandonment "has no application unless there is a total desertion by the owner without being pressed by any necessity, duty, or utility to himself, but simply because he no longer desires to possess the thing and willingly abandons it to whoever wishes to possess it." *Id.* at 762 (citations omitted). Intent must be inferred from all the facts and circumstances. *Id.*

■ The evidence does not support a finding that plaintiff abandoned his equipment after the condemnation proceeding. There was a restraining order preventing Paul from entering the property until January 19, 1978, and the Corps prevented plaintiff from entering the property after the condemnation proceeding.[18] These facts negate any suggestion that any physical abandonment of equipment was wholly voluntary and without "coercion or pressure." More importantly, Paul testified that he asked both the Corps and the district court for permission to enter the Wells tract to retrieve his equipment. He also sought to be included as a party in the

condemnation proceeding. He therefore did not possess the "positive intention to part with ownership" which is necessary for abandonment. *Katsaris*, 684 F.2d at 762 (citing *McIver v. Norman*, 187 Or. 516, 527, 213 P.2d 144 (1949)).

**3. Was there a taking of plaintiff's property?**

■ When, as here, the Government exercises its power of eminent domain formally through condemnation proceedings, the nature and extent of the interest to be acquired are within the Government's discretion. *See United States v. 101.88 Acres of Land, Etc.*, 616 F.2d 762, 767 (5th Cir. 1980). When such interests are specified unambiguously in the condemnation complaint, a court has no power to alter them, *id.*, and the interest taken is limited by the condemnation complaint. *United States v. 45.50 Acres of Land, Etc.*, 634 F.2d 405, 407 (8th Cir.1980). The complaint in the condemnation action involving the Wells tract is not of record.[19] Plaintiff was not listed as a defendant in the eminent domain action. It was apparently that fact combined with its finding that Paul's interests were limited to personalty that lead the district court to conclude it had no jurisdiction. It is obvious, however, that the intent and the effect of the Government's conduct was a taking. An intent to take property can be implied from the facts. *Sun Oil Company v. United States*, 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978) (citing *Lemmons v. United States*, 204 Ct.Cl. 404, 414 n. 5, 496 F.2d 864, 869 n. 5 (1974)). Both Nosow and Jeter testified that the Corps intended to take the oil and gas equipment on the Wells tract. In addition, even after the restraining order preventing plaintiff from entering Wells's land was lifted, the Corps would not permit Paul to enter the

---

however, because the personalty at issue belongs to a non-landowner, Paul, who was prevented from getting access to the land.

**18.** Permitting plaintiff to enter to recover limited amounts of stacked pipe and offering to let him salvage equipment on any condemned wells on payment of $100 per well does not support defendant's position. Plaintiff's declination is hardly tantamount to abandonment

given that recovery was limited to specific pipe and that acceptance of the salvage offer would have involved significant recovery expense.

**19.** Defendant admits it intended to take all oil and gas equipment on the property but denies that it ever intended to take plaintiff's oil and gas equipment. It alleges no facts to support that contention and offers no explanation for drawing a distinction.

property and remove his equipment. This also suggests an intent to take plaintiff's property. The court is satisfied that the United States intended to take and did take all the oil and gas equipment on the Wells tract.

4. Damages.

In just compensation cases, value is determined by considering fair market value as of the date of taking. *See United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970). Plaintiff put on very little evidence concerning valuation. Paul testified that he had no intention of selling the equipment on the Wells' land at the time it was condemned because he needed it on three other nearby properties in Lawrence County. In light of the fact that the equipment was in place and that he had a use for it, it was worth "every dime that is shown on the appreciation schedule." He also averred that because of the oil crisis in the early seventies, there had been an increased demand for oil and gas production equipment, which increased the price he could get for his equipment should he decide to sell it. Paul testified that the depreciation schedule is an accurate indication of what the equipment was worth. The schedule suggests a value of somewhere between $60,000.00 and $65,000.00 for the equipment which Nosow testified remained on the property. (This does not include casing.)

Some of the major pieces of equipment and their cost, as listed on the depreciation schedule, are as follows:

—Five 12 hp Wisconsin gas engines with clutches, power unit, $3,500.00.
—Two 12 hp Wisconsin gas engines, $1,250.00.
—Four 12 hp Tecumseh gas engines, $2,040.00.
—Two oil and gas separators, $3,600.00.
—One National low pressure 30′ × 10′ oil and gas separator, $5,450.00.
—One Oilwell pump jack assembly, $1,750.00.
—Two National pump jack assemblies, $3,500.00.
—One Churchill pump jack, $1,750.00.

—Three pump jack assemblies, $6,000.00.
—Seven down hole pump assemblies, $4,480.00.

The depreciation schedule also lists many thousand feet of tubing and casing of various sizes. The total cost of the equipment, as listed on the depreciation schedule, is $177,705.00. The schedule lists the salvage value of the equipment as $15,930.00.

In addition, plaintiff offered into evidence a valuation for all the equipment listed on the Viking depreciation schedule. The valuation was prepared by Oilfield Research, Inc. for the Government. Although it came into the record without objection, neither party explained how the values were derived or provided the court with a means of assessing the weight to be given the valuation.

Defendant's evidence concerning value came primarily from Nosow. For purposes of this lawsuit, Nosow prepared an appraisal of the equipment he believed was on the property at the time of taking. He arrived at a figure of $16,450.00. The breakdown of Nosow's figure is as follows:

| | | |
|---|---|---|
| Tanks for storage: | 1–200 BBL | $ 750.00 |
| | 2–100 BBL | 1,000.00 |
| | 1–60 BBL | 200.00 |
| Line Pipe 13,000 ft. at $0.40/ft: | | 5,200.00 |
| Separators, two at $900.00 each: | | 1,800.00 |
| Pump Jacks, six at $750.00 each: | | 4,500.00 |
| Miscellaneous: | | 3,000.00 |

(Well head assemblies, down hole pumps, tees, ells, couplings, swages, plugs, valves, packers, gas meter assemblies, well heads.)

Nosow gave plaintiff credit for six pump jacks, even though he only observed three, because plaintiff insisted there were six on the property. He assigned no value to casing in the ground, however, because he determined that the cost of removing it would outweigh its resale value. In addition, the price for the line pipe includes a $.50 deduction per foot for the cost of uncoupling, stacking, and hauling.

Nosow used a combination of many sources in valuing the equipment, including records from major companies that had bought equipment in 1977. He used publications which advertised used equipment

such as the Oil and Gas Journal from 1977. Another source was a document entitled "Sale of Government Property—Item Bid Page—Sealed Bid" dated January 29, 1979. Nosow testified that the document is dated close enough to the date of taking to give a good indication of the price equipment was sold for on a bid basis.[20]

Regarding whether the oil embargo caused prices to skyrocket in 1977, Nosow responded: "No. It never really skyrocketed." He admitted, however, that it "became short supply for a while, it was hard to get and at that time there was an increase in the cost of tubular goods...." He also stated that according to an article in World Oil, most of the rise in prices occurred in 1973 and 1974 and had leveled off by 1977.

■ Nosow's valuation is more credible than plaintiff's depreciation schedule or the Oilfield Research valuation. The schedule simply lists the original cost of the equipment. Paul testified that, because of the oil crisis at that time, the equipment would have brought the same price used as new. He provided no concrete basis for this statement.[21] Nosow, on the other hand, based his estimates on trade journals and other identifiable sources. He also stated that oil prices had leveled off by 1977. Nosow's valuation, which is based on comparable sales of similar equipment made at or near the time of condemnation, is the result of a more objective analysis.

The court concludes that Paul's equipment should be valued as used, not new. One aspect of Nosow's appraisal has to be separately addressed, however. He discounted line pipe by $.50 per foot for removal expense and gave no credit for cas-

ing, which he felt had to be abandoned in the ground because of the cost of removal. Plaintiff contends that the value of the equipment in place on the leasehold is the relevant measure of value, that removal costs are irrelevant.

Under more normal circumstances, plaintiff would be correct. Just compensation requires that the owner of property be put "in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). It would certainly be unfair to discount the real value of the equipment on the land (i.e., as if there had been no taking) by the costs of a removal occasioned solely by the Government. *See United States v. 40.00 Acres of Land, Etc.*, 427 F.Supp. 434, 441 (W.D.Mo.1976) (construing § 302 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4652 (1988)); 4 Nichols on Eminent Domain § 13.121[2] at 13–68 (3rd rev. ed. 1989) ("Where trade fixtures are involved—even though the tenant is in possession under a tenancy at will—he is entitled to the difference in value between the trade fixtures in place and their value as severed.")[22] In the normal case it may be that any recovery for personalty or fixtures would be discounted for value remaining after removal.

A case which sheds some light on the appropriate means of valuing personalty is *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). The controversy in that eminent domain action concerned the value of certain structures and equipment. The plaintiff in that case had the

---

**20.** The document refers to sales of seven 100 barrel storage tanks. Six of these were sold for $510.00, one for $150.00. Nosow allowed $1,000.00 for two tanks. A Churchill pump with a three horsepower motor, rated at 2,864 pounds, sold for $689.00. Nosow allowed $750.00 per pump jack.

**21.** It is also important to note that the equipment at the time of condemnation was not only used, but also appeared to be in disrepair. Of the major pieces of equipment left on the property, the pump jacks were the most recently

purchased. They had been purchased in March 1975, two years before the condemnation proceeding. Nosow stated that only one appeared to be reworkable.

**22.** Even though the district court ruled that the oil and gas equipment was personalty belonging to Paul, references to precedent regarding value of fixtures is relevant. Personalty can normally be more readily removed than fixtures. In the present case, however, plaintiff was prevented from removing his property.

right to remove the structures, but the Government only offered to pay the salvage value of the structures and equipment and the value of their use and occupancy over the remaining term of the lease. The value of the structures and equipment would have been substantially greater in place than measured at salvage value at the end of the lease term. Plaintiff sought to recover the value of the building, equipment and leasehold as a viable, ongoing unit with the possibility of lease renewal.

■ The Court focused on the fair market value of the leasehold as if no taking had occurred, stating that the issue posed was what a willing buyer would pay in cash to a willing seller. *Id.* at 474, 93 S.Ct. at 794. In ruling for plaintiff, the Court taught that a correct valuation in that instance would take into account the possibility that the lease might be renewed:

> It seems particularly likely in this case that Almota could have sold the leasehold at a price that would have reflected the continued ability of the buyer to use the improvements over their useful life.... In a free market, Almota would hardly have sold the leasehold to a purchaser who paid only for the use of the facilities over the remainder of the lease term, with Almota retaining the right thereafter to remove the facilities—in effect the right of salvage. "Because these fixtures diminish in value upon removal, a measure of damages less than their fair market value for use in place would constitute a substantial taking without just compensation."

*Id.* at 475, 93 S.Ct. at 475 (quoting *United States v. 1,132.50 Acres of Land, Etc.,* 441 F.2d 356, 358 (2nd Cir.1971)). The lesson from *Almota,* therefore, is that the actual market circumstances and economic realities prevailing immediately prior to condemnation are what determine value.

■ In applying these general considerations, the court is persuaded that the result here should be different than that in *Almota.* Plaintiff's entire approach to the purchase of the leasehold puts a very different cast on the question, "What would a willing buyer have paid for the equipment in July 1977?" The key distinction is that the very reason plaintiff purchased the leasehold, the whole purpose for investing in refurbishing the wells, was to inflate the value of the plaintiff's seven eighths working interest in the oil and gas lease. He entered into the arrangement *because* of the condemnation. Any realistic assessment of fair market value has to take cognizance of the fact that Paul knew from the outset that the only buyer of his interests would be the Government and that he would shortly have to remove as much equipment as he could.

The equipment had only two sources of value. The first was the degree to which it contributed to a functioning oil and gas leasehold. In that regard, it is noteworthy that the plaintiff's leasehold had been terminated prior to the condemnation through no effort of the Government. In addition, the oil and gas equipment never became part of a functioning network. The wells never came on line. The equipment happened to be on the property at the time of the taking, but it served no purpose there. The second source of value was as equipment reusable elsewhere. Unlike the plaintiffs in *United States v. 40.00 Acres of Land* and *Almota,* Paul brought his equipment onto the property in anticipation of a condemnation action. He could not have had any expectation that a reasonable buyer would have paid for the equipment he brought onto the property as if it could be part of a going leasehold. He brought the equipment onto the land in the hopes of raising the value of his leasehold and then removing what equipment he could use for himself elsewhere. Under these circumstances, the equipment value should be discounted for the cost of removal.

Paul testified that it would cost about $20,000 to remove the well casings and seal the wells according to Kentucky law. Plaintiff put into evidence two documents showing a value of the casing, his own depreciation schedule and the Oilfield Research valuation. The depreciation schedule reflects a purchase price of $50,727. The Oilfield Research valuation shows the

equipment to be worth $25,596. Plaintiff introduced the latter document and relies on it in post-trial briefing. He would be hard pressed, therefore, to claim a value in excess of $25,596 for the casing. By his own admission, removing the casing and plugging the wells would cost about $20,-000. There is little to contradict Nosow's assessment, therefore, that the cost of removal of the casing would exceed its value. The court finds that plaintiff is entitled to nothing for that pipe. Similarly, there is no counter to Nosow's testimony that the cost of removing the feeder lines would be $.50 per foot.

In sum, the court finds that $16,850 [23] is the fair market value of the property at the time of the taking. This figure must be reduced, however, for the $9,000 mistakenly paid to plaintiff as part of the district court proceedings. Plaintiff is thus entitled to $7,850.

### 5. Interest.

■ Plaintiff is entitled to interest on his recovery. *Yaist v. United States,* 17 Cl.Ct. 246, 261 (1989) ("[t]o afford complete relief in a just compensation action, a property owner is entitled to interest accruing from the date of taking") (citing *United States v. Thayer–West Point Hotel Co.,* 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947)). The court sees no special circumstances in this case [24] to award compounded interest. *Yaist,* 17 Cl.Ct. at 262 (Claims Court has consistently followed the rule of applying simple interest); *but see ITT Corp. v. United States,* 17 Cl.Ct. 199 (1989) (Claims Court held that owner of a patent that was infringed by the United States was entitled to compound interest). The rate to be applied is 8.5 percent per annum from the date of taking until 1979, and the

rate utilized by the Contract Disputes Act at 41 U.S.C. § 611 (1988) for the period beginning January 1, 1980. *See Yaist,* 17 Cl.Ct. at 262.

### 6. Reasonable attorneys' fees.

■ In addition to interest, plaintiff is entitled to reasonable attorneys' fees incurred in connection with his claim by virtue of 42 U.S.C. § 4654(c).[25] In *Foster v. United States,* 3 Cl.Ct. 738, 739 n. 7 (1983) (citing *Cherokee Nation v. United States,* 174 Ct.Cl. 131, 355 F.2d 945 (1966), *aff'd,* 746 F.2d 1491 (Fed.Cir.1984)), this court set forth thirteen factors which, in general, should be considered in awarding attorneys' fees and expenses. Of primary importance is consideration of the number of hours reasonably expended and the hourly rate that is reasonable and customary for the type of work involved. 3 Cl.Ct. at 740; *see also, Cloverport Sand & Gravel Co. v. United States,* 10 Cl.Ct. 121, 122 (1986).

The total amount of attorneys' fees and expenses sought is $64,312.64. This reflects fees charged by four law firms or attorneys. Plaintiff testified that he initially paid $800 to an attorney whose name he could not recall. Representation was subsequently turned over to Neil Banks, who handled Paul's interests in the district court action. Plaintiff testified that he "paid him approximately $12,000 and probably $2,000 or $2,500 in expense money."

The only real documentation plaintiff introduced concerning fees or expenses reflect the billings of two firms with which plaintiff's present counsel, John Lowery, was associated. One document is entitled "Billing Memorandum." It indicates the tasks performed, the person performing

---

**23.** The court uses Paul's figure of 14,000 feet for the flow line pipe. Nosow gave credit for 13,-000 feet without explaining why Paul's assessment for what was installed was incorrect. Some flow lines were buried, which may account for the difference.

**24.** *See Dynamics Corp. of America v. United States,* 766 F.2d 518, 520 (Fed.Cir.1985).

**25.** 42 U.S.C. § 4654(c) (1988) provides in relevant part:

(c) Claims against the United States
  The court rendering judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, ... shall determine and award or allow to such plaintiff, as a part of such judgment ..., such sum as will in the opinion of the court ... reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

the tasks, the time required for the tasks, and the hourly rate charged in connection with plaintiff's case while Mr. Lowery was a partner in the law firm of Kutak, Rock and Campbell in Atlanta. The memoranda covers the time period from March of 1988, when present counsel of record began to represent plaintiff, through September of 1989. The second document gives similar information for the time period February 1990 through April 1990. During this period Mr. Lowery was with Pursley, Howell, Lowery and Meeks, another law firm in Atlanta. An affidavit submitted by plaintiff's counsel after trial describes the services rendered through May of 1990.

Mr. Lowery testified as to his fees. He stated that the services rendered as described in these memoranda were necessary to "fairly and adequately represent Mr. Paul in connection with this matter, given the subject matter and given prevailing rates charged by attorneys of similar experience in Atlanta." He also stated that in his view the fees paid to Mr. Banks were "necessary and reasonable."

With respect to the fees incurred by plaintiff's present counsel, defendant does not challenge the documentary evidence presented by plaintiff. However, defendant urges that many of plaintiff's fees are not reasonable. In particular, defendant points out that one and three fourths hours were billed by plaintiff's counsel in attempting to recover files which, according to plaintiff's counsel, were misplaced when he left his old law firm. Defendant also argues that the Government should not have to reimburse fees paid to plaintiff's counsel for researching the rules and jurisdiction of the United States Claims Court or for a telephone conference with clients. Lastly, defendant avers that the government should not be required to reimburse plaintiff for expenses incurred by plaintiff's counsel in connection with issues upon which plaintiff did not prevail, such as the Motion for Summary Judgment and the Motion to Exclude Testimony.

With respect to these objections, the court agrees with defendant that the fee charged in connection with recovering files misplaced when plaintiff's counsel switched law firms is not recoverable. This time was incurred because of counsel's error, and the Government should not be required to pay for it. Accordingly, the court reduces fees paid to Pursley, Howell, Lowery & Meeks by $271.25 and allows $47,541.39.[26]

Defendant's other objections to fees paid to the two firms most recently representing plaintiff, however, are without merit. The activities are services which, in the court's view, are normally rendered by attorneys.

Defendant has two objections to recovery of amounts paid to the first two counsel. The first is that amounts billed in connection with the district court proceeding cannot be recovered under 42 U.S.C. § 4654. Defendant's argument in this regard is not clear. Apparently its contention is that, since the district court did not have jurisdiction over plaintiff's claim for taking of personalty, plaintiff's only recourse was to seek fees in that court under the Equal Access to Justice Act, 5 U.S.C. § 504 (1988). The court disagrees. The court is authorized to award fees arising because of such a proceeding. 42 U.S.C. § 4654(c). Insofar as relevant here, the proceeding referred to is one brought under 28 U.S.C. § 1491. When cases are transferred pursuant to 28 U.S.C. § 1631, as this one was, the actions proceed, for purposes of calculating the limitations period, as if they had been filed in the Claims Court on the day they were filed in district court. *Best v. United States*, 14 Cl.Ct. 720, 724 (1988). Moreover, the ruling of the district court has been adopted in large measure. Under these circumstances, it is appropriate to treat the district court activities as part of the Claims Court action for purposes of assessing attorneys' fees.

Defendant's second objection goes to the question of proof as to earlier counsel. When seeking attorneys' fees one must

---

26. In his post-trial brief, plaintiff seeks a total of $64,312.64. Of this amount, $47,812.64 relates to fees paid to the two firms with which Mr. Lowery has been associated.

"provide detailed records of the time and services for which fees are sought." *See Hensley v. Eckerhart,* 461 U.S. 424, 440–41, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) (Chief Justice Burger concurring in the majority opinion) (cited by *Cloverport,* 10 Cl.Ct. at 123); *see also Branning v. United States,* 7 Cl.Ct. 777, 780 (1985) (unsigned, unsworn document typed on law firm stationery, with isolated references to the litigation at hand, such as receipt of papers, conversations with plaintiff, library research, or drafting petition which became complaint, was insufficient to justify recovery), *aff'd,* 784 F.2d 361 (Fed.Cir.1986). Although the court in *Cloverport,* 10 Cl.Ct. at 123–24, found that plaintiff failed to adequately document attorney's fees, the court was "mindful that 'some' effort was expended by plaintiffs," and, in the exercise of its "discretionary judgment," awarded an amount it considered to be "reasonable under the circumstances." The court has seen portions of the district court pleadings and orders. There is no question that Neil Banks performed substantial services on plaintiff's behalf. The court declines to award the full amount claimed,[27] however, since it is unsupported. Plaintiff should bear the responsibility for not providing that documentation. The court awards $7,500 as reimbursement for fees to Banks. There was no proof of costs. Nothing is awarded for the fees paid to the unnamed first counsel.

## CONCLUSIONS

The United States took plaintiff's oil and gas equipment when it condemned the land upon which it stood. The value of that equipment was $16,850 at the time of taking. The Government is entitled to an offset of $9,000. Accordingly, plaintiff is entitled to recover $7,850. Plaintiff is entitled to recover simple interest on $16,850 from June 28, 1977 through December 1979 at 8.5 percent per annum, and at the rate established under 41 U.S.C. § 611 from January 1, 1980 to June 5, 1986. Plaintiff is entitled to recover simple interest on $7,850 from June 6, 1986. Plaintiff is also

entitled to $55,041.39 in attorneys' fees. The Clerk is directed to enter judgment accordingly.

---

**27.** Plaintiff testified he paid a total of $14,000 or $14,500 in fees and expenses to Banks. The post-trial brief seeks $15,000. No explanation is offered for the difference.