**J. Paul and Patricia PRESEAULT, and 985 Associates, Ltd., Plaintiffs,**

**v.**

**The UNITED STATES and the State of Vermont, Defendants.**

No. 90–4043L.

United States Court of Federal Claims.

May 22, 2002.

Nels Ackerson, Washington, DC, for plaintiff. Cecilia Fex, the Ackerson Group, Washington, DC, of counsel.

Susan V. Cook, Washington, DC, with whom was Assistant Attorney General Thomas L. Sansonetti, for defendant, United States.

John K. Dunleavy, Montpelier, VT, for defendant, State of Vermont.

J. Scott Detamore, Lakewood, CO, for amicus curiae Mountain States Legal Foundation.

John H. Findley, Sacramento, CA, for amicus curiae Pacific Legal Foundation.

## OPINION

MILLER, Judge.

Before the court after argument is plaintiffs' application for attorneys' fees and expenses pursuant to the Uniform Relocation Assistance and Land Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (1994) (the "URA"). Among the issues to be decided are whether and to what extent plaintiffs can recover under the URA fees for a nonprofit legal services organization and attorneys' fees incurred in other legal actions prosecuted prior to plaintiffs' suit in the Court of Federal Claims.

## FACTS

Plaintiffs J. Paul and Patricia Preseault ("plaintiffs") own a fee simple interest in land near the shore of Lake Champlain in Burlington, Vermont. *Preseault v. United States,* 100 F.3d 1525, 1531 (Fed.Cir.1996) (en banc). This tract of land consists of several previously separate properties, the identities of which date to the Nineteenth Century. The dispute in this case centered on a railroad right-of-way that traverses plaintiffs' land.

In 1981 plaintiffs brought a quiet title action in the Superior Court of Chittenden County, Vermont, alleging that the right-of-way had been abandoned both in fact and under Vermont law and that, therefore, the easement for railroad purposes had reverted to them by operation of Vermont property law. *Preseault v. United States,* 27 Fed.Cl. 69, 81 (1992). In August 1983 the Superior Court dismissed the action, holding that it lacked subject matter jurisdiction because the Interstate Commerce Commission (the "ICC")[1] had not authorized abandonment of the route and therefore still exercised valid jurisdiction over it. The Vermont Supreme Court affirmed.

In 1985 plaintiffs filed a petition with the ICC for a determination of exemption from the jurisdiction of the ICC and for a certificate of abandonment of the rail line. *Id.* at 81–82. Vermont intervened in the ICC action and petitioned the ICC to permit Vermont Railway to discontinue rail service and to transfer the right-of-way to the City of Burlington for use as a public trail under section 8(d) of the National Trails Act, 16 U.S.C. § 1247(d) (2000). In January 1986 the ICC allowed Vermont Railway to discontinue service and approved an agreement between Vermont and the City of Burlington for the use of a portion of the railroad right-of-way, including that portion traversing plaintiffs' property, as a bicycle and pedestrian path. *Preseault,* 27 Fed.Cl. at 81–82.

Plaintiffs appealed the ICC's decision to the United States Court of Appeals for the Second Circuit, challenging the constitutionality of the National Trails Act on two grounds: (1) that the act was not a valid exercise of congressional Commerce Clause power, and (2) that the act facially violated the Takings Clause of the Fifth Amendment to the U.S. Constitution. The Second Circuit rejected both of plaintiffs' claims. *Preseault v. ICC,* 853 F.2d 145, 149–50 (2d Cir.1988).

In a unanimous decision, the Supreme Court affirmed in part the decision of the court of appeals on other grounds. *Preseault v. ICC,* 494 U.S. 1, 17, 19, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). Affirming the Second Circuit's decision as to plaintiffs' Commerce Clause claim, *id.* at 18, 110 S.Ct. 914, the Court declined to evaluate the mer-

---

1. The ICC was abolished on January 1, 1996, by the ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804, which transferred certain core rail and other functions to the Surface Transportation Board. *Cross v. DOT,* 127 F.3d 1443, 1445 (Fed.Cir.1997).

its of plaintiffs' takings claim, however, holding that claim premature in the absence of a claim under the Tucker Act, 28 U.S.C. § 1491(a) (1994 & Supp. V 1999), *Preseault*, 494 U.S. at 17, 110 S.Ct. 914.

On December 26, 1990, plaintiffs filed in the United States Claims Court a Tucker Act takings claim against the United States. In 1992 this court granted summary judgment for defendant. *Preseault*, 27 Fed.Cl. at 96. The Federal Circuit initially affirmed by a panel decision, then reversed in a 1996 *en banc* decision. *Preseault*, 100 F.3d at 1552. The Federal Circuit determined that a taking had occurred and remanded the case to the Court of Federal Claims to determine damages. *Id.*

After completion of an appraisal by plaintiffs, the failure of extensive settlement negotiations, briefing on the scope of plaintiffs' property interest and plaintiffs' motion to assign a new judge, delay due to defense counsel's medical needs, and cancellation of three firm trial dates, trial took place in May 2001 to determine the scope and value of the property interest taken. The court issued its findings of fact and conclusions of law from the bench, and, by order dated May 22, 2001, awarded plaintiffs $234,000.00, plus interest, in compensation for the taking of their property.

Plaintiffs application for attorneys' fees and expenses was filed by leave on July 3, 2001. On September 5, 2001, on motion of the parties, the court referred plaintiffs' application to a settlement judge for Alternative Dispute Resolution proceedings. On February 12, 2002, the settlement judge reported that the parties were unable to reach an agreement on attorneys' fees and expenses. Oral argument was held on plaintiffs' application on April 2, 2002, and supplemental briefing was allowed to address the briefs filed by two *amici*.[2]

After supplementing the application to account for fees and expenses incurred subsequent to plaintiffs' original filing, plaintiffs seek $1,312,407.90 in fees and $153,437.49 in expenses, for a total claim of $1,465,845.39.[3]

## DISCUSSION

42 U.S.C. § 4654(c) states:

Claims against the United States. The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of title 28, United States Code, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

Plaintiffs have the burden of demonstrating that the amount sought for attorneys' fees and costs meets statutory requirements. *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see, e.g., Cloverport Sand & Gravel Co. v. United States*, 10 Cl.Ct. 121, 124 (1986). Three questions are raised in this case: (1) whether some of plaintiffs' fees were incurred "because of" plaintiffs' takings claim; (2) whether some of plaintiffs' fees were "actually incurred"; and (3) whether some or all of plaintiffs' fees are "reasonable."

### 1. *Because of such proceeding*

Under the plain language of the URA, plaintiffs only may recover fees incurred "because of such proceeding"—that is, because of "a proceeding brought under section 1346(a)(2) or 1491 of title 28, United States Code." *Emeny v. United States*, 208 Ct.Cl. 522, 527, 526 F.2d 1121, 1124 (1975) (per curiam); *Shelden v. United States*, 34 Fed.

---

2. The court allowed defendant to file a sur-reply to address the arguments of the *amici* as well as arguments raised for the first time by plaintiffs in their April 1, 2002 brief. Plaintiffs' motion to strike this brief hereby is denied.

3. Plaintiffs proffer these figures as subtotals and totals of the fees and expenses requested for plaintiffs' attorneys, experts, and consultants. The court notes that plaintiffs apparently have miscalculated these figures since their February 21, 2002 submission.

Cl. 355, 374 (1995). Section 4654(c) does not provide for the reimbursement of expenses incurred by plaintiffs before their decision to file suit in the Court of Federal Claims. *Yancey v. United States*, 915 F.2d 1534, 1543 (Fed.Cir.1990); *Emeny*, 208 Ct.Cl. at 527, 526 F.2d at 1124 (declining to reimburse plaintiff for prelitigation expenses incurred to ascertain nature and extent of property right and to negotiate for government recognition of such right).

### 1) Pre–Tucker Act litigation

■ Plaintiffs seek reimbursement for fees and expenses incurred during their appeal of the ICC's January 1986 decision to the Second Circuit. In that appeal plaintiffs unsuccessfully argued that section 1247(d) of the National Trails Act was an invalid exercise of the Congress's power under the Commerce Clause and that the statute was unconstitutional because it took private property without just compensation in violation of the Fifth Amendment. *Preseault*, 853 F.2d at 149–50. With regard to the takings claim, the Second Circuit reasoned that, because the ICC had plenary authority to determine whether to allow a railway carrier to abandon a route, plaintiffs' reversionary interest, if any, was not postponed any more by the operation of section 1247(d) than it could otherwise be affected by the ICC. *Id.* at 151.

The Supreme Court affirmed, but on the reasoning that "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." *Preseault*, 494 U.S. at at 11, 110 S.Ct. 914 (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). The Court reasoned that, through the Tucker Act, the Government had provided an adequate process for obtaining compensation, and that, if plaintiffs obtained compensation through that process, they would have no takings claim. *Id.* at 11–12, 110 S.Ct. 914.

The Court then proceeded to determine whether plaintiffs could state a claim under the Tucker Act, noting that the "proper inquiry" was not whether the National Trails Act affirmatively demonstrates congressional intent to allow a Tucker Act remedy, but, rather, whether Congress exhibited the "unambiguous intention to withdraw the Tucker Act remedy." *Id.* at 12, 110 S.Ct. 914. The Court acknowledged that the default presumption was that just compensation could be obtained in this court under the Tucker Act. *Id.* at 13, 110 S.Ct. 914.

Although this litigation occurred prior to the filing of their Tucker Act claim, plaintiffs nevertheless argue that the proceedings were "because of" the later claim because the ICC appeal was necessary to their action in this court. They rely on *Paul v. United States*, 21 Cl.Ct. 415 (1990), for the proposition that an applicant can recover fees incurred for litigation that is related to or contributes to the Tucker Act takings claim. In that case plaintiff owned personal property on real property that the Government formally condemned. He therefore filed a notice of appearance in the district court condemnation proceedings. The district court determined that the condemnation did not reach personalty taken from individuals not named in the condemnation proceeding and transferred plaintiff's claims to the Claims Court for adjudication under the Tucker Act. *Id.* at 419. Thus, plaintiff attempted to join a condemnation proceeding in order to obtain just compensation for his property and, upon transfer, asserted an inverse condemnation claim for just compensation. His objectives were the same in both fora—to obtain just compensation for the taking of his property. *Id.* at 429.

In contrast, plaintiffs in the case at bar first sought to invalidate the Government's action as unconstitutional. Contrary to plaintiffs' assertions, their litigation in the Court of Federal Claims was not "a continuation of the proceedings from earlier ones." Pls.' Br. filed Apr. 1, 2002, at 40. Nor is it true that in *Paul* plaintiff sought the "wrong remedies in the wrong court[ ]." *Id.* at 41. Unlike the plaintiff in *Paul*, who sought one remedy and had his case transferred from one forum to another, plaintiffs' litigation in the Court of Federal Claims was instituted for entirely different purposes. Plaintiffs did

not appeal the ICC ruling "because of" their inverse condemnation action in the Court of Federal Claims. Instead, plaintiffs appealed the ICC ruling "because of" their desire to invalidate the National Trails Act. Only after these efforts failed did plaintiffs pursue a monetary remedy in the Court of Federal Claims.

At no time did any uncertainty exist that plaintiffs could bring a claim under the Tucker Act. As the Supreme Court acknowledged, the Tucker Act remedy always had been available to plaintiffs. *Preseault*, 494 U.S. at 13, 110 S.Ct. 914. Plaintiffs, as was their right, instead sought to invalidate the National Trails Act and ultimately to quiet title in their name. To this end, plaintiffs argued against the existence of a Tucker Act remedy. Plaintiffs reasoned that the National Trails Act denied authorization for those conversions that might result in takings, so that such unauthorized conduct could not give rise to a claim cognizable under the Tucker Act. The Court acknowledged that this was "a thinly veiled attempt to circumvent the established method for determining whether Tucker Act relief is available for claims arising out of takings pursuant to a federal statute." *Id.*

Just compensation requires that the property owner be put "in as good a position pecuniarily as if his property had not been taken. He must be made whole but is entitled to no more." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). Neither the concepts of just compensation nor the policies underlying the URA are intended to reimburse property-owners who first attempt to undo the taking of their property. Like the plaintiff who unsuccessfully attempts to negotiate a resolution of his controversy with the Government prior to bringing a takings claim, *see Emeny*, 208 Ct.Cl. at 527, 526 F.2d at 1124, a plaintiff who seeks to reverse the taking on other grounds cannot recover compensation for expenses incurred to that end under the URA.

To be sure, during the appeal of their ICC petition, plaintiffs obtained the adjudication of significant issues related to their takings claim. *See Preseault*, 100 F.3d at 1550 (relying on Justice O'Connor's concurring opinion as to when federal regulatory regimes displace state property rights for takings purposes); *Preseault*, 27 Fed.Cl. at 92 (same); *Preseault v. United States*, 24 Cl.Ct. 818, 830–31 (1992) (same). The URA, nonetheless will only compensate plaintiffs for fees incurred because of the Tucker Act takings claim. Because plaintiffs did not appeal the ICC ruling because of their Tucker Act claim, but, rather, appealed in spite of any claim they had for just compensation, the fees incurred in their ICC were not incurred because of the proceedings in the Court of Federal Claims.

Plaintiffs therefore cannot recover fees incurred for Richard E. Davies Associates; Clark Gravel; or Fadem, Berger & Norton. The September 11, 1989 and April 23, 1990 invoices submitted for Langrock Sperry & Wool also contain unrecoverable entries related to the ICC appeal.

### 2) *Miscellaneous other matters*

■ Plaintiffs incurred $960.00 in fees for Carl Taylor's research regarding a possible lawsuit under 42 U.S.C. § 1983 (1994); $162.00 in fees for identical work by Roesler, Whittlesey, Meekins & Amidon; and $252.50 charged by Wayne G. Walker. This work bears no relationship to plaintiffs' claim for just compensation under the Fifth Amendment.

■ The invoices submitted by plaintiffs also contain a substantial number of entries referring to a lawsuit or lien filed in a Virginia state court against plaintiffs by their one-time counsel of record, Paul Harris. Invoices from Marzulla & Marzulla contain $2,410.00 in charges related to Mr. Harris's action.[4] On July 14, 1999, Affloter, Gannon & Flynn billed plaintiffs for 0.8 hours of work on Mr. Harris's lawsuit. Calculated according to the $120.00 per-hour rate apparently used in that invoice and used in the March 9,

---

4. May 1, 1998: $442.50; June 2, 1998: $442.50; July 31, 1998: $206.50; September 2, 1998: $847.00; and October 1, 1998: $471.50.

1997 invoice, $96.00 cannot be recovered, as it was not incurred because of this litigation.

Plaintiffs also have failed to establish that $3,160.75 in costs incurred by Liam Murphy between April 6, 2001, and April 16, 2001, are related to this case. Instead, these costs appear related to plaintiffs' efforts to convince the City of Burlington to route the bike path beneath their property.

### 2. *Actually incurred*

Under the URA plaintiffs only may recover fees "actually incurred" because of the litigation.

### 1) *New England Legal Foundation*

Plaintiffs seek legal fees for the New England Legal Foundation ("NELF"), a nonprofit legal services organization that nominally represented plaintiffs on a *pro bono* basis, but with an express agreement that NELF would receive any fees or costs recovered in the lawsuit. Defendant argues that no fees can be awarded for NELF services because plaintiffs have not been billed for, have not paid, and are not legally obligated to pay for NELF's services.

Federal Circuit precedent establishes that attorneys' fees are "incurred" under other fee-shifting statutes when a litigant is represented by a legal services organization or counsel appearing *pro bono*. *Ed A. Wilson, Inc. v. General Services Admin.*, 126 F.3d 1406, 1409 (Fed.Cir.1997). The Federal Circuit further holds that, in these situations, "to be 'incurred' within the meaning of a fee shifting statute, there must be an express or

implied agreement that the fee award will be paid over to the legal representative." *Phillips v. GSA*, 924 F.2d 1577, 1583 (Fed.Cir. 1991). Fees are incurred by a litigant represented by a pre-paid legal service plan or counsel working *pro bono* when, although the litigant is not personally liable for the fees, he is subject to an obligation to turn over any fees awarded. *Id.* at 1582–83 & n. 4; *accord Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 933 n. 4 (Fed.Cir.2000) (en banc).[5] When an agreement exists to support the conditional obligation, a plaintiff is not viewed as simply having been given legal aid; instead, this condition is the cost to the plaintiff of obtaining those services.

Plaintiffs bear the burden of establishing an implied agreement that representation was undertaken on the condition that plaintiffs would seek, and NELF would recover, attorneys' fees. Discharge of this burden entails demonstrating that plaintiffs are under some obligation so as to have "incurred" fees within the meaning of *Phillips* and *Raney*. On this matter plaintiffs have offered the unrebutted affidavit testimony of plaintiff J. Paul Preseault:

> My fee arrangement with [NELF] was a pro bono engagement. I was not expected to pay for the legal services of Attorney Hannifin or others in the employ of [NELF]. We agreed that, upon resolution of my case either through settlement or trial, [NELF] would seek to have their attorney's fees reimbursed by the United States.

---

**5.** Notwithstanding the language of *Phillips*, in *Ed A. Wilson* the Federal Circuit suggested that the proper standard was open to debate. The court stated that, generally, "the presence of an attorney-client relationship suffices to entitle prevailing litigants to receive fee awards." 126 F.3d at 1409. The court also recognized the standard announced in *Phillips* and quoted prior case law to the effect that "attorney's fees are incurred by a litigant 'if they are incurred in his behalf, even though he does not pay them.'" *Id.* (quoting *Goodrich v. Dep't of the Navy*, 733 F.2d 1578, 1579 (Fed.Cir.1984)). *Cf. Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (holding that an award under a statute providing for "a reasonable attorney's fee," but not requiring that the fee be "incurred," need not be limited to amount actually agreed to in

contingency agreement). *Ed A. Wilson* concluded that "whether the linchpin to an award of attorney fees is the actual payment of attorney fees, the existence of an attorney-client relationship, or the incurrence of fees on behalf of an applicant, [plaintiff] meets the standard." *Id.* at 1410. The Court of Federal Claims is in no position to conclude that the three-judge panel in *Ed A. Wilson* displaced established precedent of the Federal Circuit, *see South Corp. v. United States*, 690 F.2d 1368, 1370–71 & n. 2 (Fed.Cir. 1982) (holding that binding precedent in Federal Circuit can only be overruled by Federal Circuit *en banc*), and so has addressed plaintiffs' application under *Phillips* as if that case were still good law, leaving any tension between *Phillips* and *Ed A. Wilson* for the Federal Circuit to resolve.

Affidavit of J. Paul Preseault, Mar. 28, 2002, ¶ 18. Plaintiffs also submitted a Memorandum of Understanding between plaintiffs, NELF, and the Defenders of Property Rights ("DPR"), dated June 2, 1997, substituting DPR as counsel for plaintiffs. The memorandum states: "Upon resolution of this matter (either through settlement or trial), both DPR and NELF will seek to have their attorney fees reimbursed by the United States."

Although the court is skeptical of plaintiffs' inability to document their agreement with NELF, defendant has not made any factual argument on the matter, and plaintiffs' evidence stands uncontroverted. Instead, defendant argues that the language of the URA requires a different construction of the word "incurred" than that given to other fee-shifting statutes. Under defendant's interpretation of the URA, plaintiffs must either have paid or be obligated to pay the fees requested in their application.

■■■ Statutory construction begins with the language of the statute. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 122 S.Ct. 941, 950, 151 L.Ed.2d 908 (2002). Fee-shifting statutes are to be construed narrowly, not only because they waive the sovereign's immunity from suit, *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685–86, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), but also because they are in derogation of the common law American Rule that parties are to bear their own attorneys' fees, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533–34, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

■■ Defendant first argues that use of the word "incurred" must be construed differently in the URA than it is in other fee-shifting statutes. *Cf. Brickwood Contrs., Inc. v. United States*, 288 F.3d 1371, 1377 (Fed.Cir. 2002) (noting that commonality of certain terms or art, such as "prevailing party," among fee-shifting statutes requires consistent construction of those terms); *Raney*, 222 F.3d at 932 (applying uniform construction of "reasonable attorney fees"). Section 4654(c) only authorizes the court to "reimburse such plaintiff for his reasonable costs, disbursements, and expenses." Defendant puts forth the words "reimburse" and "his"

as manifesting Congress's intention to authorize fees only when plaintiffs have gone out-of-pocket or into debt to procure legal representation.

Contrary to defendant's argument, neither the language nor the policy of the URA distinguishes the act's use of "incurred" from that of other fee-shifting statutes. Both the Back Pay Act, the statute at issue in *Raney*, and the Equal Access to Justice Act (the "EAJA"), the statute at issue in *Phillips*, provide that the award should comprise "fees and other expenses ... incurred *by that party*." 28 U.S.C. § 2412(d)(1)(A) (1994 & Supp. V 1999) (emphasis added); *accord* 5 U.S.C. §§ 5596(b)(1)(A)(ii), 7701(g) (2000). Indeed, the Back Pay Act is a "reimbursement statute, to facilitate making whole the wronged employee." *Naekel v. FAA*, 845 F.2d 976, 980 (Fed.Cir.1988). The URA's use of the word "reimburse" does no more to restrict recovery to out-of-pocket expenses than other fee-shifting statutes and does not evade the reasoning of *Phillips* and *Raney* that a plaintiff who has obtained representation on the condition that he seek fees for his attorneys has incurred an obligation that can be reimbursed by a fee-shifting statute. *See also Brickwood Contrs.*, 288 F.3d at 1378 (question is not whether certain differences appear between two statutes employing a common term, but whether these differences reasonably would lead one to conclude that a term should be construed differently than in other statutes).

Second, defendant argues that, because "incurred" in the URA is modified by the word "actually," the URA does not allow a fee award for attorneys appearing *pro bono*. In *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1375 (Fed.Cir.2002), the Federal Circuit defined "to incur," in the context of a fee-shifting statute, as "[t]o become liable or subject to." (Quoting *Black's Law Dictionary*). The addition of the word "actually," defined by the *Oxford English Dictionary* as "[i]n act or fact; as opposed to possibly, potentially, theoretically, ideally," appears to do little to qualify this meaning. *See SEC v. Comserv Corp.*, 908 F.2d 1407, 1414 n. 9 (8th Cir.1990) (finding no apparent difference between phrase "actually incurred" in URA and

word "incurred" in EAJA). Colloquially, at least, one is either liable or one is not—no difference distinguishes one who has become liable from one who actually has become liable. Conversely, an obligation that is not "actually incurred" simply is not "incurred." In fact, "actually incurred" and "incurred" commonly are used interchangeably throughout the case law concerning fee-shifting statutes. *E.g., TGS Int'l, Inc. v. United States,* 983 F.2d 229, 230 (Fed.Cir.1993) (EAJA award); *Sun–Tek Indus., Inc. v. Kennedy Sky–Lites, Inc.,* 865 F.2d 1254, 1255 (Fed. Cir.1989) (Rule 38); *Naekel,* 845 F.2d at 980 (EAJA and Back Pay Act).

As discussed above, the Federal Circuit holds that fees are "'incurred' within the meaning of a fee shifting statute" when there is "an express or implied agreement that the fee award will be paid over to the legal representative." *Phillips,* 924 F.2d at 1582–83 & n. 4; *Raney,* 222 F.3d at 933 n. 4. Again, addition of the word "actually" does not effect any material change. The plaintiffs in *Phillips* were under an actual—not constructive—obligation to transfer any fees recovered to their counsel—hence, the court's insistence on an express or implied agreement to that effect. This same straightforward reasoning has guided several decisions applying the URA to contingency agreements. *See King v. United States,* 205 Ct.Cl. 512, 520, 504 F.2d 1138, 1143 (1974) (awarding "a reasonable fee ... for plaintiffs' counsel which conforms to counsel's arrangements with plaintiffs for a 25 percent contingency basis"); *Osprey Pac. Corp. v. United States,* 42 Fed.Cl. 740, 742 (1999) (obligations under contingency fee agreements are "actually incurred" under URA). This case does not present the classic *pro bono* legal agreement; although Mr. Preseault used the term *"pro bono"* to describe NELF, the agreement between the two was nothing less than a contingency agreement negotiated at arms-length.

Defendant suggests that Congress used "actually incurred" to avoid the result reached in cases such as *Phillips* and to limit recovery to fees actually paid or owed by the plaintiff. Defendant offers no evidence of congressional intent to support this argument beyond the use of the word "actually." Defendant relies instead on *Raney,* in which the Federal Circuit, sitting *en banc,* held that the Back Pay Act, 5 U.S.C. § 5596(b), permits the award of attorneys' fees at prevailing market rates to litigants represented by salaried attorneys of a nonprofit labor union. The Back Pay Act, unlike the URA, states only that fees must be "incurred." *Id.* §§ 5596(b)(1)(A)(ii), 7701(g). The dissent in *Raney* argued that "incurred" required that "the fees awarded must be the fees actually incurred by the [plaintiff], the fees actually billed rather than some speculative or punitive award." 222 F.3d at 940 & n. 9 (Rader, J., dissenting). The majority disagreed, rejoining that the dissent improperly "restrict[ed] 'reasonable attorney fees incurred' to fees 'reasonable attorney fees actually incurred,'" and "impose[d] a limitation which Congress neither expressed nor intended." *Id.* at 934.

> Congress has passed a variety of statutes that have specifically referred to attorney fees as "incurred," but the courts have neither interpreted the "incurred" term in these statutes to restrict or limit the payment of fees to those actually incurred, nor prevented market-rate fees from being awarded.

*Id.; see also Gotro v. R & B Realty Group,* 69 F.3d 1485, 1487 (9th Cir.1995) (construing 28 U.S.C. § 1447(c) (1994 & Supp. V 1999) to not require that fees be "actually 'incurred'").

Defendant reads *Raney* to hold unequivocally that "actually incurred" means actually paid or owed. This court does not agree. The debate quoted above concerned whether fees must be measured by the market value of the services rendered or the actual cost to the provider of the attorneys' services. *See Raney,* 222 F.3d at 934–35; *id.* at 942 (Rader, J., dissenting). Both the majority and the dissent agreed that litigants represented by union counsel could recover fees, but the dissent argued that those fees should be limited to a *pro rata* share of the union attorneys' salaries. According to the dissent, these were the fees "incurred" by the litigant, even though the salaries were paid by a

third party, the union. *Id.* at 940 n. 9 (Rader, J., dissenting).[6]

Any insight that *Raney* offers in the construction of the URA is therefore to suggest that the effect of the word "actually" may operate to limit fees to the actual cost of the legal services rendered, as opposed to utilizing prevailing market rates. This court, however, is hesitant to impute such a holding to *Raney.* That court was not faced with a statute containing the words "actually incurred." Moreover, the majority repeatedly noted that the question of statutory interpretation in that case was not raised by the parties, but by the dissent *sua sponte. Id.* at 931, 936. It is highly unlikely, then, that the Federal Circuit intended to resolve a dispute as to the meaning of the URA when neither the URA nor a dispute properly were before it.

The *Raney* majority, instead, was far more concerned with the phrase "reasonable attorney fees"—a phrase common among fee-shifting statutes and used in the URA. *Raney* held that the Back Pay Act's use of the phrase "reasonable attorney fees" meant "prevailing market-rate attorney fees," because Congress was presumed to have been aware that this was the prevailing judicial interpretation of that phrase in other fee-shifting statutes. *Id.* at 932–33. The same can be said of congressional intent with regard to the URA. *See also Brickwood Contrs.,* 288 F.3d at 1377. Consequently, while the plain meaning of "actually" does little to alter the plain meaning of "incurred," the phrase "reasonable attorney fees" indicates that fees will be recovered at prevailing market rates rather than according to the actual cost to the attorney.

The policies underlying the URA do not mandate a different result. Like the Back

Pay Act, the URA generally is a reimbursement statute designed to ensure that the plaintiff has received just compensation for the taking of his property. *Cf. Naekel,* 845 F.2d at 980. Section 4654(c) recognizes that when "the government takes property without initiating condemnation proceedings, it 'shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation.'" *Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 712, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (internal quotation omitted). Section 4654(c) seeks to overcome the "significant disadvantage" borne by the plaintiff in such a case. *Id.* Whether or not Congress intended section 4654(c) to deter or punish the Government is not clear, although the URA strongly indicates that land acquisition should occur through negotiation or condemnation. *See* 42 U.S.C. § 4651 (1994 & Supp. V 1999) (stating that one purpose of statute is "to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion of the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices"). What is clear is that Congress intended to ensure that all citizens be able to vindicate their right to just compensation. So long as it is reasonable, the URA will relieve successful plaintiffs of whatever obligation they incurred to obtain legal representation to assert their rights. *Cf. Penn. v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (reasoning that, where purpose of fee-shifting statute was to enable private parties to obtain legal help in seeking redress for injuries, "if plaintiffs ... find it possible to en-

---

6. The reasoning of the dissent in *Raney* parallels the holding of the Seventh Circuit in *State of Wisconsin v. Hotline Indus., Inc.,* 236 F.3d 363 (7th Cir.2000). That case concerned the fee-shifting provision governing improper removal, 28 U.S.C. § 1447(c), which provides for the recovery of "actual expenses, including attorney fees, incurred as a result of the removal." *Hotline Indus.* held that this provision did not allow for the use of a market rate as the measure of compensation. 236 F.3d at 366. The court nevertheless rejected the defendant's argument that

the plaintiff did not incur any attorneys' fees because its lawyers were salaried employees. The court reasoned: "But salaried government lawyers, like in-house and non-profit counsel, do incur expenses if the time and resources they devote to one case are not available for other work." *Id.* at 365; *see also Huffman v. Saul Holdings Ltd. P'ship,* 262 F.3d 1128, 1135 (10th Cir.2001) ("To be compensable, their fees must be actually 'incurred,' that is, they must reflect efforts expended to resist removal.").

gage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied").

Contrary to defendant's argument, the award plaintiffs seek will not provide them with more than just compensation. Because fees are only awarded in situations where "an express or implied agreement [is present] that the fee award will be paid over to the legal representative," *Phillips*, 924 F.2d at 1583, plaintiffs stand to gain nothing more than what was necessary to procure legal representation in the first place. Nor does the Government stand to lose any more than it would have had plaintiffs retained private counsel, for, as the remainder of this opinion will explicate, the statute limits any such award to "reasonable" fees. Instead, NELF will recover the fee award on which it predicated its agreement to represent plaintiffs, so long as the amount is reasonable.

NELF's reasonable attorneys' fees were incurred by plaintiffs based on their agreement that any fees collected in the litigation would go to their attorneys. *Phillips*, 924 F.2d at 1582; *Raney*, 222 F.3d at 933 n. 4. Indeed, such fees were "actually incurred" by reason of this express agreement. The fact that these fees are not paid or owed by the litigant, but rather are born initially by a third party like the union in *Raney*, or an attorney appearing *pro bono*, does not prevent recovery of those fees under the URA. Defendant's construction of the statute does not qualify the word "incurred"; it changes its meaning to "paid," and defendant's real argument that NELF's fees were not actually incurred is that they were not actually paid by plaintiffs.

### 3. *Reasonable*

Section 4654(c) authorizes reimbursement only for "reasonable" expenses that otherwise satisfy the statute.

### 1) *Reasonable rates*

 Plaintiffs generally established that the fees actually charged by their attorneys "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Plaintiffs, however, initially calculated attorneys' fees to reflect their attorneys' higher current hourly rates, rather that the rate at which plaintiffs were actually billed, contending that current rates were appropriate "to compensate for the delay in payment and lost opportunity otherwise experienced by the party bearing the burden of delay." Pls.' Br. filed July 3, 2002, at 2. "[I]nterest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest." *Library of Congress v. Shaw*, 478 U.S. 310, 311, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Plaintiffs' request to be compensated for "delay" and "lost opportunity" is tantamount to a request for interest on their attorneys' fees and expenses. *Id.* at 322, 106 S.Ct. 2957 ("Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money."). Although the Fifth Amendment itself provides for interest as an aspect of "just compensation," *id.* at 317 n. 5, 106 S.Ct. 2957, "[a]ttorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain," *Dohany v. Rogers*, 281 U.S. 362, 368, 50 S.Ct. 299, 74 L.Ed. 904 (1930). Because waivers of sovereign immunity to suit must be read against the backdrop of the no-interest rule, a general waiver as to attorneys' fees, without more, does not waive the sovereign's immunity from interest. *Shaw*, 478 U.S. at 318–19, 106 S.Ct. 2957. Recognizing this limitation, plaintiffs amended the majority of their petition to request only fees actually billed.

Plaintiffs did not recompute fees for Marzulla & Marzulla and for Wayne G. Walker. Plaintiffs offered no argument why a higher rate is more reasonable than the rate at which services were actually billed. *Shelden v. United States*, 41 Fed.Cl. 347, 351 (1998). Accordingly, plaintiffs can only recover fees actually invoiced by these attorneys.

Plaintiffs also failed to establish a reasonable rate for NELF's fees. Patrick Hanifin, in his declaration submitted with plaintiffs' application, states that, in 1991, he submitted a fee request to a federal district court in

Boston based on an hourly rate of $185.00, which he believed was a reasonable rate at that time for an attorney of his experience in his legal community. *See* Declaration of Patrick W. Hanifin, July 9, 2001, ¶ 23. Nevertheless, plaintiffs and Mr. Hanifin calculated his fees based on a $250.00 rate because they believed that "[a] reasonable billing rate for an award of attorneys' fees is the rate that attorneys of similar experience in the community charge when the litigation concludes." Hanifin Decl. ¶ 24. Mr. Hanifin arrived at the $250.00 rate based on cases decided by the Eastern District of Massachusetts in 1999 and 2000. Such a rate, according to Mr. Hanifin, "compensates for years of delay in payment of the fee and lack of interest on the fee despite that delay." *Id.*

To the extent that the $250.00 rate represents interest on NELF's fees, it exceeds the waiver of sovereign immunity in the URA. Moreover, a $185.00 rate itself is not supported adequately by evidence. "[S]omething more than an attorney's own affidavit is required to establish the prevailing market rate for attorney's fees." *Raney,* 222 F.3d at 938 (citing *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541). Similarly, plaintiffs have not established adequately reasonable rates for Christine Hughes and Cynthia L. Amara. The court notes that, in 1987, the First Circuit held that $140.00 to $175.00 per hour was the prevailing market rate for skilled litigation services in the Boston area. *Hall v. Ochs,* 817 F.2d 920, 928 (1st Cir.1987). This court therefore takes notice that a $175.00 rate is within the range of prevailing market rates for NELF's efforts. *See Morris v. Sec'y of HHS,* 20 Cl.Ct. 14, 30 (1990) (determining appropriate rate where plaintiff failed to carry its burden); *Cloverport,* 10 Cl.Ct. at 123–24 (exercising "discretionary judgment" to determine a reasonable fee where it is clear that significant efforts were in fact expended, if not adequately documented). Accordingly, plaintiffs can only recover fees for Mr. Hanifin, Ms. Hughes, and Ms.

Amara calculated at $175.00 an hour. Plaintiffs submitted time records from NELF detailing 1,106 hours worked on this case by Mr. Hanifin. Plaintiffs cannot recover for hours worked for which no records are provided, Mr. Hanifin's affidavit notwithstanding. *See Paul,* 21 Cl.Ct. at 430.

Plaintiffs also procured the expert testimony of John Osgood regarding the proper method of valuation of severance damages. Mr. Osgood, an expert in real estate development specializing in marketable properties for real estate development, as well as site selection, the development of economic and financial analysis, construction costs, and market pricing, charged plaintiffs $275.00 per hour. Plaintiffs have provided no evidence that this rate is reasonable for Mr. Osgood's services—a rate more than three times the fee charged by plaintiffs' other experts. The court determines that plaintiffs can only recover for Mr. Osgood's services at $82.00 per hour, the average rate of plaintiffs' other experts that billed by the hour.[7]

### 2) *Recusal motions and appeal*

■ All fees incurred for plaintiffs' April 24, 2000 Motion for Assignment of a Judge Other Than the Settlement Judge and subsequent related filings are unrecoverable under the URA. As the court noted at the time, the numerous blatant factual errors in plaintiffs' April 24 motion "impugn[ ] the integrity of the court, distort[ ] the record, and misrepresent[ ] the proceedings that have occurred." Order filed May 30, 2000 at 1 (citing, *inter alia, Pac–Tec, Inc. v. Amerace Corp.,* 903 F.2d 796, 804 n. 6 (Fed.Cir.1990) (noting counsel's obligation to know record and present it accurately), and *Lindemann Maschinenfabrik, GmbH v. American Hoist & Derrick Co.,* 895 F.2d 1403, 1405–06 (Fed.Cir. 1990) (noting impermissibility of advocate's misquoting court's prior opinion)). The court's order warned that "the filing of any other pleadings misrepresenting the record will be subject to sanctions." Order filed

---

7. Plaintiffs also claim expert/consulting fees by invoice dated April 11, 2001, for Liam Murphy at a rate of $175.00 per hour, which appears to be his billing rate as an attorney. Because Mr. Murphy testified both as a fact witness and as a legal expert on local zoning and real estate law, and in light of defendant's silence on the matter, the court concludes that the rate for his services is reasonable. *See* Transcript of Proceedings, *Preseault v. United States,* No. 90–4043L, at 169–70 (Fed.Cl. May 15, 2001).

May 30, 2000 at 8. Plaintiffs nevertheless made just such a filing in their June 13, 2000 motion for reconsideration. *See* Order filed June 21, 2000, at 1.

The court does not question plaintiffs' right to seek recusal or reassignment in good faith. Moreover, this sort of motions practice may be necessary to advance a particular case and therefore would be reimbursable under the URA. Plaintiffs' filings, however, were not made in good faith. The sanctionable conduct of plaintiffs' attorneys was not merely unreasonable; it was neither ethical nor legitimate advocacy. Under the URA the taxpayers are not obliged to reimburse plaintiffs for sharp tactics that undermine the integrity of the judicial process.

Plaintiffs cannot recover $31,853.16 in fees and expenses for Carl Taylor's work on the recusal motion, motion for reconsideration, and appeal, $2,026.50 for such work by Roesler Whittlesey,[8] as well as $4,800.00 for the consulting fees of Prof. Ronald D. Rotunda, who prepared a declaration in support of plaintiffs' motion for reconsideration.

### 3) *Inadequate documentation*

In *Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed.Cir. 1987), the Federal Circuit concluded that "under EAJA contemporaneous records of attorney's time and usual billing rates, as well as a breakdown of expenses, are necessary in order to determine the reasonableness of the charges." Unlike the EAJA, the URA does not require "an itemized statement from any attorney or expert witness . . . stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B). Nevertheless, the basic logic, if not the strict rule, of *Naporano* applies with equal force to the URA, which also requires that fees and costs be "reasonable": Without sufficient detail, a court is unable to determine whether the hours, fees, and expenses are reasonable for any individual item invoiced.

Many of the invoices submitted from Langrock Sperry do not contain sufficient detail to determine whether the specific amounts invoiced are reasonable. These invoices contain daily entries describing work performed and a total fee for the billing period. The invoices generally do not provide a total number of hours worked for each billing period, let alone let alone for a day, nor do they indicate who worked on the case at any given time.[9] Moreover, because the invoices also do not provide a billing rate, neither total hours nor the billing rate can be determined algebraically from the total charge. *But see Naporano*, 825 F.2d at 405 ("We reject unequivocally any suggestion that the Claims Court had an obligation to reconstruct the bills for [plaintiff]."). Plaintiffs cannot recover the amounts invoiced by Langrock Sperry from June 22, 1990, through August 14, 1998, and on August 28, 2001.[10]

Plaintiffs separately submitted three additional invoices from Langrock Sperry by which they claim $8,619.33 in expert/consult-

---

**8.** Plaintiffs' invoices from Carl Taylor and Roesler Whittlesey have daily entries, reporting only the total number of hours worked per day. Plaintiffs have provided no means to determine how much work was devoted to a given matter per day. Accordingly, plaintiffs cannot recover the following amounts for Carl Taylor: $7,200.00 (May 18, 2000); $467.27 (May 18, 2000 expense); $5,160.00 (June 7, 2000); $7,280.00 (July 3, 2000); $10,560.00 (August 24, 2000); $317.83 (August 29, 2000 expense); $560.00 (October 1, 2000); and $308.06 (October 1, 2000 expense). Nor can plaintiffs recover the following amounts for Roesler Whittlesey: $285.00 (May 8, 2000); $202.50 (June 1, 2000); $945.00 (July 11, 2000); $135.00 (August 3, 2000); and $459.00 (September 7, 2000).

**9.** In this manner, the Langrock Sperry invoices are considerably less detailed than the Ackerson Group's September 29, 2000 invoice, the adequacy of which defendant has not challenged and which the court has accepted, but which may not be sufficient under the EAJA.

**10.** The court further notes that the September 21, 1990 invoice appears to concern plaintiffs' settlement efforts after the Supreme Court's decision and therefore comprises charges that were not incurred because of this case. Additionally, plaintiffs would not be able to recover for the March 11, 1991 invoice relating to the dissolution of an entity called "Concepts in Carpentry, Inc.," the April 10, 1992 invoice regarding a trespass case; or the January 20, 1993 invoice regarding a limited partnership certificate, because they have not established that these fees are related to this case.

ing fees for Liam Murphy. The June 19, 2001 and February 15, 2001 invoices suffer from the same deficiencies as those submitted to document attorneys' fees incurred by Langrock Sperry.

### 4) *Other unallowable costs*

Plaintiffs incurred fees for Carl Taylor's work in the amount of $2,780.00 for what he terms "second bite" cases. Similarly, Roesler Whittlesey's February 15, 2002 invoice contains an entry detailing a telephone conference to review this research. These billing entries neither establish that these charges are related to this case nor that they are reasonable.

Invoices from Roesler Whittlesey charged plaintiffs with interest on unpaid fees amounting to $82.74. As discussed above, interest on attorneys' fees and expenses is not recoverable under the URA. Moreover, it is patently unreasonable to ask the taxpayers to reimburse plaintiffs for any delinquency in paying their attorneys' bills.

Plaintiffs also improperly claim $288.71 for meals as a litigation expense. *See Shelden,* 41 Fed.Cl. at 349. Finally, Roesler Whittlesey also charged plaintiffs $104.97 to purchase a WordPerfect Office 2000 upgrade and $35.50 to obtain a copy of a local news broadcast. Neither of these fees is reasonable.

### 5) *Excessive, redundant, or otherwise unnecessary fees*

■ The court does not lightly second-guess plaintiffs' determination of what costs are reasonable. Normally,

> the risk of abuse is minimal because plaintiff has no assurance of recovering and must assume it will bear the full cost of litigation. Plaintiff can therefore be expected to exercise control over the time spent and the rates charged.

*PCI/RCI v. United States,* 37 Fed.Cl. 785, 792 (1997) (quoting *Florida Rock Indus., Inc. v. United States,* 9 Cl.Ct. 285, 289 (1985)). In this case, however, over half of the allowable fees requested by plaintiffs were incurred after liability was determined and recovery under the URA was triggered. The court therefore cannot defer to the discipline of the market, but must assure itself of the reasonableness of the fees requested by plaintiffs.

Costs that are "excessive, redundant, or otherwise unnecessary" are not recoverable under a fee-shifting statute that reimburses "reasonable" attorneys' fees. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. For this reason the costs of having one set of experienced, competent, and highly paid attorneys review the work of another set of experienced, competent, and highly paid attorneys is not reasonable. *Emeny,* 208 Ct.Cl. at 530, 526 F.2d at 1126; *Cloverport,* 10 Cl.Ct. at 125.

Plaintiffs seek fees and expenses for nine different legal organizations. The invoices prepared by these organizations reveal that 14 different attorneys represented plaintiffs at various stages of this litigation, including the seven different attorneys that served as counsel of record at one point or another. The invoices submitted by plaintiffs for attorneys' fees are saturated with charges for efforts to transfer, copy, and review the case file and to research and review background legal issues. Each time plaintiffs changed counsel, these efforts were repeated. Plaintiffs' invoices reveal that a substantial amount of effort was devoted to discussion of the case with past, present, and prospective counsel and to review and comment on other attorneys' efforts. These invoices also reveal inordinate charges for preparing and reviewing applications for admission and motions to substitute counsel. Moreover, plaintiffs also incurred fees for assistance in their decision to fire certain attorneys and in locating and retaining other attorneys.

Plaintiffs' invoices disclose that their attorneys used a minimum quarter-hour billing increment that resulted in inordinate charges for simple tasks, such as leaving and reviewing e-mail and voice-mail messages. *See, e.g., Hagan v. MRS Assocs.,* No. 99–3749, 2001 WL 531119, *4–*5, 2001 U.S. Dist. LEXIS 6789, at *16–*21 (E.D.La. May, 16, 2001) (reducing fee award by 10% to account for inadequacy of quarter-hour billing increment); *Zucker v. Occidental Petroleum Corp.,* 968 F.Supp. 1396, 1403 (C.D.Cal.1997) (reducing fee award by 5% to account for

unearned legal fees accumulated through use of quarter-hour billing increments). Plaintiffs' invoices show that their attorneys performed tasks that should have been performed by paralegals or clerical staff, such as obtaining docket sheets and filings from the Clerk's office, and copying and filing documents. *See Mich. v. EPA,* 254 F.3d 1087, 1095–96 (D.C.Cir.2001); *cf. Mo. v. Jenkins,* 491 U.S. 274, 288–89 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (noting that it is appropriate to distinguish between work that may be performed by lawyers from that by paralegals and that value of work performed by non-lawyer is not enhanced because lawyer does it).

It also appears likely that more time was spent on the Harris lawsuit and Mr. Taylor's sanctionable recusal efforts than is reflected in the billing records. Roesler Whittlesey's invoices, for example, suggest that substantially more than $2,026.50 was incurred on this matter. That figure represents entries that explicitly refer to the motion to reassign, but the invoices contain numerous entries broadly describing conversations with Mr. Taylor and reviews of documents prepared by Mr. Taylor. Additionally, the Ackerson Group's September 29, 2000 invoice for the period from October 7, 1999, through August 31, 2000, which contains numerous entries regarding Mr. Taylor's work, including specific entries regarding the motion to reassign, does not provide a daily account of hours worked or fees charged. That invoice provides daily descriptions of work performed and a total number of hours and fees charged for the billing period.[11] Accordingly, it is impossible to determine the total amount incurred reviewing and commenting on Mr. Taylor's inaccurate and misleading recusal efforts.

For these reasons, the court concludes that an additional 20% reduction in allowable attorneys' fees is necessary to arrive at a reasonable reimbursement. Such a *pro rata* reduction is within the court's discretion. *See, e.g., Tenn. Gas Pipeline Co. v. 104 Acres of Land,* 32 F.3d 632, 633–34 (1st Cir.1994) (affirming 30% reduction under URA where records indicate fees may be excessive or duplicative); *Cloverport,* 10 Cl.Ct. at 125 (10% reduction for duplication of efforts under URA); *cf. Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933 (trial courts have discretion to reduce fee *pro rata* according to degree of success achieved); *Cmty. Heating & Plumbing Co. v. Garrett,* 2 F.3d 1143, 1146 (Fed. Cir.1993) (same).

### 4. *Calculation*

The following table documents the court's calculation of fees and expenses awarded to plaintiffs under the URA.

Attorneys' Fees

The Ackerson Group
| | |
|---|---|
| Total requested/invoiced | 660,831.70 |
| Allowed | 660,831.70 |

Richard A. Affloter
| | | |
|---|---|---|
| Total requested/invoiced | 5,477.40 | |
| Disallowed | 96.00 | (not "because of") |
| Allowed | 5,381.40 | |

New England Legal Foundation
| | | |
|---|---|---|
| Total requested | 325,566.88 | |
| Fees invoiced | 199,911.25 | (1,142.35 hours at $175 per hour) |
| Expenses invoiced | 9,731.16 | |
| Disallowed | (20,387.50)[12] | |

11. Plaintiffs account for the majority of the Ackerson Group's fees by invoices that provide daily descriptions of work performed, the total number of hours per day, and the total amount charged per day. Defendant estimates that the Ackerson Group billed plaintiffs $11,174.00 in fees and $3,576.00 in expenses for recusal matters, but does not explain how it arrived at this figure.

12. 116.5 hours worked in February of 1992 appear on both the 1992 and 1990–92 NELF records.

Allowed . . . . . . . . . . . . . . . . . . . . . . 189,254.91

Patrick Hanifin (non-NELF)
 Total requested 34,934.92
 Fees invoiced 22,656.25 (156.25 hours at $145 per hour)
 Expenses invoiced 81.52
 Allowed . . . . . . . . . . . . . . . . . . . . . . 22,737.77

Brennan Kelley
 Total requested/invoiced 625.00
 Allowed . . . . . . . . . . . . . . . . . . . . . . . 625.00

Langrock Sperry & Wool
 Total requested 6,918.25
 Total invoiced 7,105.75
 Disallowed (201.50) (duplicate of P01982–0003–010)
 (5,773.74) (inadequate documentation)
 (955.50) (not "because of")
 Allowed . . . . . . . . . . . . . . . . . . . . . . . 175.00

Marzulla & Marzulla
 Total requested 74,471.16
 Total invoiced 63,135.41
 Disallowed (2,410.00) (Not "because of"—Harris suit)
 Allowed . . . . . . . . . . . . . . . . . . . . . . 60,725.41

Roesler, Whittlesey, Meekins & Amidon
 Total requested 76,856.21 (1st supp.)
 7,141.16 (2d supp.)
 7,728.67 (3d supp.)
 91,726.04

 Total invoiced 75,318.04 (1st supp., minus credits)
 7,141.16 (2d supp.) [13]
 7,728.67 (3d supp.)
 90,187.87
 Disallowed (109.36) (interest)
 (2,026.50) (recusal)
 (162.00) (not "because of"—1983)
 (94.50) (second bite)
 (288.71) (meals)
 (104.97) (WordPerfect upgrade)
 (35.50) (local tv broadcast)
 Allowed . . . . . . . . . . . . . . . . . . . . . . 87,366.33

Carl Taylor
 Total requested/invoiced 54,348.28
 Disallowed (31,853.16) (recusal)
 (960.00) (not "because of"—1983)
 (2,780.00) (second bite)
 Allowed . . . . . . . . . . . . . . . . . . . . . . 18,755.12

Wayne G. Walker
 Total requested 7,639.50
 Total invoiced 4,036.40 (minus deleted line items)

---

**13.** Plaintiffs actually submitted invoices totaling $8,652.56, but only claim $7,141.16 in their February 21, 2002 submission. Plaintiffs did not explain their calculation.

Disallowed (252.50) (not "because of"—1983)
Allowed ......................... 3,783.90

Total attorneys' fees
Allowed 1,049,636.54
Less 20% (209,927.31)
Total attorneys' fees recoverable ........ 839,709.23

Expenses

Allen Agency Real Estate
 Total requested/invoiced 2,200.00
 Allowed ......................... 2,200.00

Beaudin Associates
 Total requested/invoiced 4,810.00[14]
 Allowed ......................... 4,810.00

Chris Haley
 Total requested/invoiced 550.00
 Allowed ......................... 550.00

Michael Keller
 Total requested/invoiced 18,652.50
 Allowed ......................... 18,652.50

Koerner Designs
 Total requested/invoiced 767.50
 Allowed ......................... 767.50

Liam Murphy
 Total requested/invoiced 8,619.33
 Disallowed (5,962.50) (inadequate documentation–6/19 inv.)
 (787.50) (inadequate documentation–2/15 inv.)
 Allowed ......................... 1,869.33

O'Leary–Burke Civil Associates
 Total requested/invoiced 7,235.75[15]
 Disallowed (3,160.75) (not "because of"-proposed underpass)
 Allowed ......................... 4,075.00

John Osgood
 Total requested/invoiced 7,646.54
 Allowed ......................... 2,300.44 (recalculated at $82 rate)

Warren A. Robenstien
 Total requested/invoiced 2,378.50
 Allowed ......................... 2,378.50

Ronald D. Rotunda
 Total requested/invoiced 4,800.00
 Disallowed (4,800.00) (recusal)

**14.** Plaintiffs submitted invoices totaling $4,956.25, but only claim $4,810.00 in their February 21, 2002 submission. Plaintiffs did not explain their calculation.

**15.** Plaintiffs' request adequately addresses the issues raised in defendant's response.

Allowed . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0.00

Bruce A. Taylor
Total requested/invoiced 10,300.00
Allowed . . . . . . . . . . . . . . . . . . . . . . . 10,300.00

Miscellaneous Expenses
Total requested 17,634.98
Allowed . . . . . . . . . . . . . . . . . . . . . . . 7,243.10[16]

Total Expenses
Actually incurred/recoverable 55,146.37

Total award . . . . . . . . . . . . . . . . . . . . . . $894,855.60

---

## CONCLUSION

Accordingly, based on the forgoing,

1. The Clerk of the Court shall enter judgment for plaintiffs on their complaint in the amount of $234,000.00, plus interest from the date of the taking, February 5, 1986. Interest shall be calculated on an annual compound basis, using successive 52–week Treasury bill rates. *See NRG Co. v. United States,* 31 Fed.Cl. 659, 669 (1994).

2. Plaintiffs' application for attorneys' fees is granted consistent with this opinion. The Clerk of the Court shall enter judgment for plaintiffs on its application for fees and expenses under the URA in the amount of $894,855.60.

**IT IS SO ORDERED.**

---

**16.** The amount allowed for Mr. Preseaults' miscellaneous expenses generally correlates to the amounts recognized by defendant as allowable in its March 13, 2002 brief. The amount allowed includes costs claimed by plaintiffs in their supplemental submissions, as well as certain travel costs objected to by defendant.